McMILLAN, Appellant, vs. CITY OF FOND DU LAC, Respondent.

*February 20—May 11, 1909.*

*Municipal corporations: Illegal contracts: Taxpayer's action: Paving contracts: Injunction.*

1. A municipality upon hearing of official misconduct of a member of its common council relative to a street-paving contract, violative of sec. 4475, Stats. (1898), has power, and it is its duty, to refuse to consummate an executory contract therefor, and this power and duty a taxpayer may enforce.
2. An offer by the holder of an executory contract for street paving to furnish a construction company, bidding on other street improvements, material therefor at a less price than that quoted by manufacturers (even though such manufacturers have unlawfully combined to raise the price of such material), made

McMillan v. Fond du Lac, 139 Wis. 367.

for the purpose of inducing a member of the common council,. who was also interested in the construction company, to withdraw his official opposition to such executory contract, and carried out by concessions as to price, is within the condemnation of sec. 4475, Stats. (1898). The consent of the municipality to such executory contract, in part purchased by such concession, is unlawful and invalid, and a taxpayer may enjoin its execution.

3. To hold that such transaction is void only as between the holder of the executory contract and the construction company would be to make official immorality and consequent illegality a mere matter of judicial declamation. Nothing less than enjoining the execution of the executory contract is adequate to vindicate the law.

APPEAL from a judgment of the circuit court for Fond du Lac county: MARTIN L. LUECK, Judge. *Reversed.*

*H. E. Swett,* for the appellant, cited, among other cases, *Herman v. Oconto,* 100 Wis. 391, 76 N. W. 364; *S. C.* 110 Wis. 660, 86 N. W. 681; *Chippewa Valley & S. R. Co. v. C., St. P., M. & O. R. Co.* 75 Wis. 224, 44 N. W. 17; *Dean v. Charlton,* 23 Wis. 590; *United B. Church v. Vandusen,* 37 Wis. 54; *University v. People,* 99 U. S. 309; *New Orleans Waterworks Co. v. Rivers,* 115 U. S. 674, 6 Sup. Ct. 273; *Walla Walla v. Walla Walla W. Co.* 172 U. S. 1, 19 Sup. Ct. 77; *Fisk v. Jefferson P. J.* 116 U. S. 131, 6 Sup. Ct. 329; *Walston v. Nevin,* 128 U. S. 578, 9 Sup. Ct. 192; *Winnebago F. Mfg. Co. v. Fond du Lac Co.* 113 Wis. 72, 88 N. W. 1018; *Quayle v. Bayfield Co.* 114 Wis. 108, 89 N. W. 892; 1 Pom. Eq. Jur. § 260; 2 Pom. Eq. Jur. § 931.

*M. K. Reilly,* for the respondent, cited, besides other authorities, *Adams v. Beloit,* 105 Wis. 363, 81 N. W. 869; *Warner v. Knox,* 50 Wis. 429, 7 N. W. 372; *Boyd v. Milwaukee,* 92 Wis. 456, 66 N. W. 603; *Schintgen v. La Crosse,* 117 Wis. 158, 94 N. W. 84; *Washburn v. Oshkosh,* 60 Wis. 453, 19 N. W. 364; *Zwietusch v. Milwaukee,* 55 Wis. 369, 13 N. W. 227; *Cawker v. Central B. P. Co.* 133 Wis. 29, 113 N. W. 419; *Ballard v. Appleton,* 26 Wis. 67.

The following opinion was filed March 9, 1909:

TIMLIN, J.   This action was brought by the plaintiff in his own behalf and in behalf of all others similarly situated for an injunction against the letting of a contract by the defendant city to the Barber Asphalt Paving Company.   Plaintiff is a lotowner abutting on Park avenue, and it is also averred that plaintiff is a general taxpayer in the defendant city and that the paving of crossings is required to be paid for by the city, and that one of the aldermen of said city was interested in other paving contracts requiring brick pavement, and between this alderman and the Barber Asphalt Paving Company there existed a secret and corrupt agreement for the purpose of eliminating competition and securing all the contracts for paving to be let by the city, the profits thereon to be divided between the alderman and the Barber Asphalt Paving Company.   The complaint contains other averments not necessary to be noticed on this appeal.   The circuit court made findings of fact with great detail, and such findings are challenged on this appeal as not supported by the evidence.

The twenty-third finding of fact is as follows:

"That there is no evidence that any alderman, or any official of said city, has been promised or received from the Barber Asphalt Paving Company, or from any person, any rebate or money or corrupt consideration whatever for his action, or his vote, or his influence, in any of the matters or proceedings taken by the said city, or by the council or by any officer thereof, in and about the proposed paving of Park avenue with asphalt, and about the paving of any street of said defendant city with asphalt."

The twenty-fourth finding of fact is as follows:

"That there is no evidence that there was any secret or corrupt, or any, agreement between the Barber Asphalt Paving Company and the said Dockery mentioned in the complaint for the purpose of eliminating or avoiding competition, or for the purpose of securing all, or any, of the contracts for paving

to be laid by said defendant city, or in relation to any matter, fact, or thing concerned or relating to the proposed paving of Park avenue with asphalt or relating to the paving, or proposed paving, of any street in said defendant city."

The twenty-eighth finding is as follows:

"That the plaintiff has wholly failed to prove any of the material allegations set out in the complaint not admitted by the answer, and has wholly failed to show any fraud or corruption in, about, or relating to the proceeding for paving Park avenue with asphalt as set out in the complaint."

Nevertheless the uncontroverted evidence shows that one Dockery was a member of the board of aldermen during the year 1906 and until he resigned on August 20, 1907, and was in 1907 president of the council. In May, 1907, Mr. Dockery, with Michael McCugo and William H. Bruett, organized a corporation called the McCugo Construction Company, with an authorized capital of $25,000, each taking one third of the stock issued, and this stock was paid for by each putting in $700 in cash and transferring to the company contractors' equipment, consisting of concrete mixers, shovels, wheelbarrows, and utensils of that kind. A large amount of street improvement was then under consideration by the common council, but not fully decided upon.

The Barber Asphalt Paving Company was a corporation, and had a local agent at *Fond du Lac,* one Gavin. On June 5, 1907, the common council adopted a resolution declaring it to be the purpose of the council that Park avenue and Fourth street to Merrill street be improved at the expense of the property to be benefited thereby, by grading the roadway thereof to the established grade, and by constructing thereon an asphalt pavement under five years' guaranty, together with a Portland cement concrete combined curb and gutter, and directed the board of public works to view the premises and consider and determine the various matters and perform the various duties in said resolution specified. The board of public works, on June 20, 1907, reported that they had, among other

things, caused plans, profiles, and specifications for said contemplated improvement to be prepared and filed and that the entire cost of such work would be $25,027.67. They reported the parcels of real estate benefited by the contemplated work and the amount to be assessed for benefits. On July 2, 1907, the board of public works reported to the common council that notice of such assessment had been given and an opportunity for hearing, as required by the charter, and thereafter bids were called for and the matter of letting this contract was pending. The Barber Asphalt Paving Company was a bidder or prospective bidder upon said contract. On July 11, 1907, the city called for bids upon another contract for the paving of part of Main and Third streets with brick pavement, overlying a concrete base therein described, these bids to be received up to August 12, 1907. On August 12, 1907, Michael McCugo bid on this work, offering to make a brick pavement with five-inch concrete foundation for $2.23 per square yard, and the same on a six-inch concrete foundation for $2.26 per square yard. He did not specify what kind of paving brick he would use. There was a competitive bid by J. Rasmussen & Sons Co. on this same work, with a five-inch concrete foundation and Douville brick at $2.33 per square yard, with Purington brick $2.34 per square yard, and with Metropolitan brick $2.39 per square yard.

It appears by the oral evidence that in June, 1907, McCugo had a bid also for other contract work on Gillett street. McCugo informed Dockery that he was going to bid on Gillett street, and asked Dockery to go into the deal because a member of the McCugo Construction Company, but Dockery informed him that being a member of the council he could not participate in any contracts that were to be let by the city, and absolutely refused to do it. While Dockery was temporarily absent from the city of *Fond du Lac* McCugo put in a bid for this work on Gillett street in his own name, and the contract was awarded to him by the council before Dockery

returned.    McCugo also bid upon the work for paving Fourth street, and Dockery was somewhat active in the matter, but to what extent is not very definitely shown.    The brick which was to be used in paving under this contract for paving Main and Third streets was purchased from the Barber Asphalt Paving Company.    Dockery was asked and answered as follows:

"*Q.* Who made the contract for the brick?    *A.* The contract was originally—the contract was made financially by the McCugo Construction Company.    *Q.* The brick contract?    *A.* Yes.    *Q.* Who furnished the brick for Third street?    Was that in the same contract?    *A.* Yes."

Where a street was to be paved partially by asphalt paving and partially by brick paving and all let together in one contract, as was the case on Park avenue and Fourth street, being the contract in question, the McCugo Construction Company could not bid on it or compete with the Barber Asphalt Paving Company, but the Barber Asphalt Paving Company could bid on it because they handled both kinds of work. The witness testified that he made no arrangement with the Barber Asphalt Paving Company that he was to have a share in the work that was being done or to be done in the city of *Fond du Lac.*    And further:

"*Q.* When you made your bid for the brick work, did you experience difficulty in buying or purchasing brick that could fill the desired specifications?    Didn't all the brick dealers refuse to deal with you?    *A.* Yes, all except the Barber Asphalt Paving Company.    They tried to hold us up.    I want to explain that to the court."

The explanation of Mr. Dockery is that, having found the sellers of paving brick apparently in combination to hold up the price, which fact he ascertained from letters written by him in the name of the McCugo Construction Company, he went to Mr. Gavin, the agent of the Barber Asphalt Paving Company at *Fond du Lac,* and told him he had these letters from the different manufacturers, and that unless the price of

brick was reduced he would, in the interests of the citizens of
*Fond du Lac* and of the public, have or attempt to have the
bids for asphalt paving rejected in the common council,
whereupon the Barber Asphalt Paving Company gave a price
on brick independent of the combine, making a reduction of
$7 per thousand, and that was what the property owners made
on these two streets. They made $6,000 by compelling the
combine to make a different price on brick. Mr. Dockery tes-
tifies he was promoting the best interests of the city of *Fond
du Lac* and they got the benefit, and that he did it for the best
interests of the city, regardless of what some of the members
may think about it, and if we accept his conclusion or state-
ment of his motives his purposes were good. He further tes-
tifies: "We could not have done any bidding on the street un-
less they gave us a price on the brick." And, speaking of the
McCugo contract for brick paving, he testifies: *"Q. Was the
reduction made before the contract was made for the brick
paving? A.* Why, yes; we could not make the contract un-
less we had the price to govern it." He further testified that
at the time when McCugo got that price on brick he was in
the council, but had nothing to do with the contract. He was
president of the council while this negotiation was going on
between McCugo and the Asphalt Paving Company for the
reduced price of brick. He conducted the negotiations him-
self for the best interests of the city, and threatened Mr.
Gavin that unless they broke away from the trust and gave
the contractors the benefit of the correct price on brick he
would take the letters that he had received from the different
manufacturers in the country and have them read to the coun-
cil and published in the newspapers, and find out whether
they organized a brick trust to the detriment of the city of
*Fond du Lac* or not. He had written several letters to
the representatives of the Asphalt Paving Company at Des
Moines, Iowa, where they had their brick manufacturing
plant, called the Capital City Brick Company, during these

negotiations, and he repeats, when examined by the attorneys
for the defendant, that at the request of McCugo, who told
him ·it was impossible to get any price on brick, he took the
matter up in the name of the McCugo Construction Company,
got the names of all the manufacturers, wrote to them, ask-
ing them for cash prices on brick, and then saw Mr. Gavin
and threatened him that he should use his influence in the
council to have their bid rejected if the price of brick re-
mained.    He understood that the price fixed between the
contractors and manufacturers was $2.56 per yard for the
brick on Third and Fourth streets, and having the interest
of the city at heart, and not to go into the contracting busi-
ness himself, because he did not want it, but was a member
of the council, he did everything possible to promote the best
interests of the city of *Fond du Lac,* and in doing that some
people put a wrong construction on it.    The Barber Asphalt
Paving Company reduced their price from $27.50 per thou-
sand to $20.50 per thousand for paving brick, and McCugo·
put in a bid of $2.23 and $2.26 per yard.    Mr. Dockery
brought in a resolution to the common council to change the
mode of street paving on Park avenue from asphalt to mac-
adam pavement, and this resolution is in evidence.    It ap-
pears to have been filed July 3, 1907, was signed and offered
by Dockery, and read as follows:

"Resolved by the mayor and common council of the city
of *Fond du Lac,* that the petition of the property owners of
property abutting on Park avenue between Merrill and
Fourth streets presented herewith be granted, and that the
proceedings heretofore had and taken toward paving the same
with asphalt be and they are hereby vacated and set aside and
made null and void."

This resolution was carried.    On July 11, 1907, a resolu-
tion was presented rescinding this resolution above quoted,
and this was carried, and Mr. Dockery informs us that he
voted against the passage of the last-mentioned resolution,
but his vote was not necessary, and he had secured the reduc-
tion upon the price of brick.

To sum up the testimony of this witness, it is to the effect that with the best of motives and for the common good, while a member of the common council and a member of the construction company, another member of which was bidding on municipal contracts for brick paving, he threatened the Barber Asphalt Paving Company to use his official power, vote, and influence against them in rejecting their pending contract, or the contract in question, unless they would make a reduction on the price of brick, in which article they were dealing. They made this reduction at his request and in name to his construction company and he discontinued his opposition, permitted the resolution, which he introduced and voted for to effectuate his threat, to be rescinded, and then, after his associate McCugo had gotten the contract for brick paving at the price named per square yard, McCugo turned the contract over to the construction company, and Dockery resigned from the council and became actively and pecuniarily interested in the contract. He also testified that the former contract on Gillett street, taken in June under the name of Michael McCugo, was carried on in such a way that he (Dockery) drew the checks for disbursements under the name of the McCugo Construction Company, but he had nothing to do with McCugo, and he explains it as follows:

"Mr. McCugo was interested in the McCugo Construction Company, had his own capital all tied up there, and through an agreement to buy his material we had contracted for a very large amount of cement, which we had to use, and he was paying a profit on the cement and also a profit on the stone to the McCugo Construction Company, and I was aiding him financially to carry out the deal as I would aid anybody else."

He also answered: "I assumed the financing of the McCugo Construction Company long before I resigned from the council—from the time of its organization." We have quoted from this testimony at length for the purpose of showing the exact words of the witness in the particulars covered thereby.

McCugo, sworn as a witness, testified that he took the contract on Gillett and Green streets in his own name, that the

McCugo Construction Company assisted him by giving him its credit, and that the checks were drawn in the name of that company by Dockery, the bookkeeper, who wrote the checks, and signed by Mr. Dockery and Mr. McCugo, and that Dockery helped in financing the building of Gillett, Green, Third, and Fourth streets. He (McCugo) did not attend to the bargaining for the brick for Third and Fourth streets with the Barber Asphalt Paving Company, but he did attend to the bargaining in the sense of buying or making the contract or signing the contract. Dockery assisted him a great deal in getting prices on brick. McCugo was never able to get a price on brick before. McCugo got this reduced price on brick before putting in his bid for brick paving.

It requires an extraordinary stretch of credulity to find the McCugo Construction Company was not interested in this brick paving contract or that Dockery was getting this reduction on the price of brick for the benefit of the public. And the figures tend strongly to show that the public did not get the benefit of it, because, having gotten this reduction of $7 per thousand on paving brick, Mr. McCugo's bid was at the rate of $2.23 or $2.26 per square yard, depending upon whether he supplied five-inch or six-inch concrete base, and not specifying the kind of brick, while the bid of Rasmussen & Sons Co. was $2.34 per square yard for brick pavement with six-inch concrete foundation and Purington brick, and $2.34 per square yard for brick pavement with five-inch concrete foundation and Purington brick, with slightly lower prices for Douville brick and slightly higher for Metropolitan brick. This was a difference of eleven cents per square yard in favor of McCugo's bid, and in order that the city may be said to have benefit of $7 per thousand reduction upon the price of brick, a thousand of brick would have to pave sixty-three and a fraction square yards, and even at the price mentioned by Dockery as that of the combination before he secured the reduction, namely, $2.56 per square yard, McCugo's

lowest bid offered an advantage of only thirty-three cents per square yard, and 1,000 brick must cover twenty-one and a fraction square yards of street before it could be said that the city got the benefit of the reduction even from the price said by Dockery to be the price fixed by some combination.

We think the argumentative conclusions of Dockery have little weight against the undisputed facts. In the foregoing summary we have presented the facts as elicited from Dockery, with his statements of motives and his opinions and conclusions. But, taking the case exactly as claimed by Dockery, it is as follows: An alderman of the city, after resolutions are passed, proceedings under way, and bids called for the paving of a street with asphalt, approaches a bidder, who is also a dealer in brick, informs that bidder that unless he makes a reduction upon the price of brick the alderman will use his influence to prevent letting of the asphalt contract. The alderman then introduces a resolution rescinding the action already taken by the council and changing the proposed pavement from asphalt to macadam pavement. This alderman is interested as a stockholder in a corporation organized for the purpose of doing street and other construction work. Another member of that corporation contemplates bidding upon other city paving contracts for brick paving of streets and is engaged in street contract work. The construction corporation in which both are interested pays out the money on the existing contracts of the alderman's associate. The alderman is financing this corporation, helping it and signing its checks, but the existing contracts are not in its name. The Barber Asphalt Paving Company, prospective bidder on the asphalt contract, makes a concession of $7 per thousand to the alderman at his request and upon his threat to use his influence against the letting of contracts for asphalt paving. McCugo, the associate of the alderman, avails himself of this reduction, signs a contract with the Asphalt Paving Company for the purchase of brick, procures the brick paving contract,

and the alderman withdraws his opposition to the letting of the asphalt contract, and the city now proposes to let the contract for paving with asphalt to the Barber Asphalt Paving Company. The alderman then resigns his office, the contracts for brick paving are turned over to the construction company, and he takes charge of the work and shares in the profits. Assume in addition to the foregoing, in deference to the findings of the court below, that the alderman was actuated only by pure motives in the foregoing transaction. A statute in this state provides:

"Any person who shall corruptly give, offer or promise to any . . . officer . . . of any . . . city . . . any gift or gratuity, or any money, goods, thing in action, personal or real property, or anything of value, or any pecuniary or other personal advantage, present or prospective, with intent to influence his vote, opinion, judgment or action upon any question, matter, cause or proceeding which may then be pending or which may by law come or be brought before him in his official capacity, . . . shall be punished by imprisonment in the state prison not more than five years nor less than one year, or by fine not exceeding one thousand dollars, nor less than two hundred dollars." Sec. 4475, Stats. (1898).

If the reduction upon the price of brick made by the Barber Asphalt Paving Company at the request of Dockery was anything of value or any pecuniary or personal advantage present or prospective, it would seem that the transaction above detailed was within the letter and spirit of this statute. The question then arises whether the city, upon learning of the facts, should have rejected the bid of the Barber Asphalt Paving Company and refused to contract with it. If the city had this power and duty the taxpayer may enforce it.

In *State ex rel. Wildman v. Kidd,* 63 Wis. 337, 23 N. W. 703, it appeared that the town board of supervisors, being called upon to divide a school district and form therefrom a new school district, met for that purpose and refused to consent to the division unless the new school district should re-

linquish all claim to the division of property between it and
the old district, and that in order to obtain the passage of the
resolution creating the new school district that district did
consent to surrender all claim to a division of the school prop-
erty.    The new district was formed, but brought *mandamus*
to repudiate this claim and compel a division.    The court, in
passing upon the regularity of the action of the supervisors,
said:

"In deciding upon the question of division the town board
had no right to be actuated by any motive or consideration
other than for the public good.    If such division would, in
their judgment, be for the public welfare, then they had no
moral right to exact a pecuniary consideration from one dis-
trict to the other as a condition of making it. . . . It is the
policy of the law that all who are active in opposition to such
division, whether members of the school board or otherwise,
as well as all who are active in trying to procure such divi-
sion, shall act in good faith; and any agreement to combine
in opposition to such division, or consent thereto, in consid-
eration of money to be paid, or property or rights of property
to be surrendered, is contrary to public policy and therefore
void."

The court cites *Howard v. First Ind. Church,* 18 Md. 451,
where a contract promising to pay an abutting owner for sign-
ing a petition to pave a street by reimbursing him the cost
over $1.15 per front foot was criticised and its invalidity sug-
gested; *Maguire v. Smock,* 42 Ind. 1, 13 Am. Rep. 353,
where a contract to pay certain abutting owners a sum of
money provided they petition the city for a paving improve-
ment was adjudged illegal; *Ohio L. I. & T. Co. v. Merchants'
I. & T. Co.* 11 Humph. 1, 53 Am. Dec. 742, and other cases.
See, also, *New Haven v. N. H. & D. R. Co.* 62 Conn. 252, 25
Atl. 316, where the contract was made at the request of and
for the protection of property holders, and it was said:

"That a public officer should regulate his official conduct
by considerations of private benefit to himself or to others can
never, as we trust, receive the sanction, either express or tacit,
of this court."

In *Doane v. Chicago City R. Co.* 160 Ill. 22, 45 N. E. 507, it was decided that a contract whereby a street railway company purchased the consent of an abutting property owner to laying down of a street railway in the street in front of his property was illegal and void. This was because the common council was authorized by statute to base its legislative action upon consent of a certain number of abutting owners.

In *Shelby v. Miller,* 114 Wis. 660, 91 N. W. 86, an action was brought on a contract made with the supervisors of the plaintiff town to indemnify the town against the expense of litigation in consideration of being permitted to carry on a litigation for the town relative to the opening of a highway. The contract was held to be illegal and void.

In *State ex rel. Dosch v. Ryan,* 127 Wis. 599, 106 N. W. 1093, the town board of supervisors refused to alter a highway. An appeal was taken to commissioners appointed by the county judge as authorized by statute. The commissioners hesitated about overruling the decision of the supervisors, whereupon one of the parties petitioning for the alteration executed and gave to the commissioners a bond in the sum of $1,000 running to the town, binding himself to build the road and bridge made necessary by such alteration on or before a date therein fixed, and thereupon the commissioners unanimously decided to alter the road as petitioned for and filed their written decision to that effect. The supervisors refused to lay out the road pursuant to that decision, and upon *mandamus* to compel them so to do the trial court found as matter of fact that the majority of the commissioners were not influenced in their action by the agreement and bond and that their decision was in all respects valid, and awarded the peremptory writ of *mandamus.* The judgment was reversed in this court and the writ quashed. The court said:

"Highways are only to be laid out when the public good will thereby be promoted. Private considerations or inducement cannot rightly enter into the question in any degree. If private individuals with special interests were allowed to bargain with public officers who are exercising this important

and sovereign power, and to offer inducements of any kind tending to influence their free action, the interests of the public would be at once in jeopardy. Not only are such bargains void as against public policy, but official action based thereon ceases to be based solely upon the public welfare, and becomes tainted with some degree of private interest. . . . The decision is conclusively shown to have been, in part, based upon the fact that the bond had been given. No nice separation of motives is possible. There is safety only in the entire prohibition of such transactions."

This goes a little further than *State ex rel. Curtis v. Geneva,* 107 Wis. 1, 82 N. W. 550, but it is to be observed that in the last-mentioned case the contract to contribute money toward the construction of the road was made after the decision of the commissioners and was found not to have induced or procured that decision. See, also, *State ex rel. Newell v. Purdy,* 36 Wis. 213, and *Chippewa Valley & S. R. Co. v. C., St. P., M. & O. R. Co.* 75 Wis. 224, 44 N. W. 17. In the last-named case one railroad corporation agreed with another to refrain from making any effort to procure a land grant from the legislature and to render to the other reasonable and proper assistance in procuring such grant in consideration of receiving from the latter a portion of the land granted, and the contract was held void.

The following language is cited with approval from *Clippinger v. Hepbaugh,* 5 Watts & S. 315:

"It matters not that nothing improper was done or was expected to be done by the plaintiff. It is enough that such is the tendency of the contract; that it is contrary to sound morality and public policy, leading necessarily, in the hands of designing and corrupt men, to improper tampering with members, and the use of an extraneous secret influence over an important branch of the government. It may not corrupt all; but if it corrupts or tends to corrupt some, or if it deceives or tends to deceive or mislead some, that is sufficient to stamp its character with the seal of reprobation before a judicial tribunal." See, also, *Oscanyan v. Arms Co.* 103 U. S. 261, 264; *Hayward v. Nordberg Mfg. Co.* 85 Fed. 4, 29 C. C. A. 438, and cases in note.

In *Pingry v. Washburn,* 1 Aik. (Vt.) 264, it was held that an agreement on the part of the corporation to grant to individuals certain privileges in consideration that they should withdraw their opposition to the passage of a legislative act touching the interests of the corporation was against sound policy, prejudicial to correct and just legislation, and therefore void. *Smith v. Applegate,* 23 N. J. Law, 352. See *Washington Irr. Co. v. Krutz,* 119 Fed. 279, 56 C. C. A. 1, and cases in note. In the last-mentioned case the corporation offered to convey certain land to the register of a land office in consideration of services rendered by him concerning certain lands in controversy before the department. The officer declined to accept the land while an officer, but offered to do so after his term expired, provided the company would give him some work to do as payment for the land. After the expiration of his term he rendered some nominal service to the corporation, whereupon the same offer was renewed and accepted. But the court considered the transaction so blended with the former offer and conditional acceptance as to constitute a single transaction, void as against public policy.

The offer of the Barber Asphalt Paving Company to the McCugo Construction Company, made for the purpose of inducing Dockery to withdraw his opposition as a member of the council to their contract with the city, and carried out by concession to the McCugo Construction Company or to McCugo, was within the condemnation of the foregoing authorities. The consent of the city, in part purchased by this concession, was unlawful and invalid. It is possible that if the contract between the city and the Barber Asphalt Paving Company was executed and performed the courts would not aid in setting it aside or annulling it, but in an action like this, brought to enjoin *in limine* the making or entering into by the city of a contract so procured, the law is otherwise. If the city, being informed of the manner in which the Barber Asphalt Paving Company procured the withdrawal of op-

position to this contract, refused to recognize its illegality and proposed to reward the company's turpitude in the matter by giving it a contract so obtained, the plaintiff taxpayer of the city and a party affected by this contract may enjoin its execution. No less than this is adequate to vindicate the law. To hold the transaction void only so far as it affects the agreement between the Barber Asphalt Paving Company and the McCugo Construction Company is to make official immorality and consequent illegality a mere matter of judicial declamation attended by no more serious consequences than a lecture from the bench. *State ex rel. Dosch v. Ryan,* 127 Wis. 599, 106 N. W. 1093; Greenhood, Pub. Pol. 308, 309; *People v. Stephens,* 71 N. Y. 527; *Land, L. & L. Co. v. McIntyre,* 100 Wis. 245, 75 N. W. 964.

It is urged, apparently in extenuation of the acts of Dockery, that there was an unlawful combination for the purpose of raising the price of paving brick and thereby extorting from the city or the abutting owners large sums of money. The foundation for this claim is in some argumentative conclusions of Dockery. But even if such illegal combination existed there are other remedies and other ways of meeting it than by illegal countermoves on the part of the alderman and the bidder. Regarding the nature of the action and the necessity which the plaintiff was laboring under of procuring his evidence from the mouths of those adversely interested, the rulings of the court below were quite erroneous and illiberal, but it is not necessary to review them in detail. The judgment of the court below should be reversed, and the cause remanded with directions to enjoin the execution of the proposed contract on the part of the city.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded with directions to enter judgment for the plaintiff.

Upon a motion for a rehearing there was a brief for the appellant by *H. E. Swett,* and separate briefs for the respond-

ent by *M. K. Reilly,* attorney, and *Frank M. Hoyt,* of
counsel.

The motion was denied May 11, 1909.