MAXCY, Appellant, vs. CITY OF OSHKOSH and others, Respondents.

*November 21—December 6, 1910.*

*Wills: Construction: Public charitable trusts: Reverter: Conditions: City as trustee: Gift for manual training school: Right of city to comply with conditions: Raising additional fund: Naming school: Tuition fees, from whom exacted: Construction of building: Municipal bonds: Provision for payment of interest: Name of bonds: "Completion" of school building includes equipment.*

1. If a will contains no express provision for a reverter in the event of a diversion of a fund given for a public purpose, none can be implied.

2. After reciting that her deceased husband had wished to give property to a city *in trust* for the founding of an educational institution, and that her will was made for the purpose of car-

rying out such wish, testatrix gave property to trustees to be held in trust for the purpose of building and perpetually maintaining a manual training school. Upon certain conditions the property was to be transferred to the city or to trustees for it, to be used perpetually to provide and maintain such a school. There was no provision for a reverter. *Held*, that a public charitable trust was thereby created.

3. One giving property by will to any legitimate charity may generally prescribe the conditions under which the donation is made, and when those conditions are accepted there is a binding obligation which may be enforced through the courts.

4. In order to create a public charitable trust there must be some public benefit open to a vague and indefinite number of persons until they are selected or appointed to be the particular beneficiaries of the trust for the time being.

5. A city may become the trustee of a charitable trust where the donation is made to aid some public purpose, charitable in its nature, which it is the legal duty of the city to support and provide for; and when such a trust is accepted the city assumes the same obligations and becomes amenable to the same regulations that apply to other trustees of such trusts, and must perpetually administer the charitable fund in accordance with the expressed wish of the donor.

6. Where property is given to a city in trust to found and maintain an educational institution, upon condition that a further sum for that purpose be raised by or for the city, the city has no right to bond itself for such purpose unless it is authorized by law to maintain such a school or institution as a part of its general system of education.

7. Under its charter (Laws of 1891, ch. 59, subch. XI, sec. 4) the city of Oshkosh has power to erect one or more buildings to be used exclusively for manual training and may maintain such schools for the benefit of all pupils of school age and all other persons whom it may have the right to admit to any of its public schools.

8. A will made for the purpose of carrying out the wish of the deceased husband of testatrix to found an institution wherein sound business principles might be taught and where pupils might be fitted for manufacturing and business careers and domestic duties, gave property for the purpose of founding and perpetually maintaining "a manual training school" the object of which should be to teach cooking, sewing, and domestic economy to girls, and "all things of mechanical and other technical work to young men, and to teach to both girls and boys such

things as are usually taught in modern manual training schools,
and . . . such things as the progress of time develops ought to
be taught in a manual training school." *Held*, that the school
so provided for was such a manual training school as the city
of Oshkosh had a right to maintain at public expense, and that
the city might, therefore, accept the donation and comply with
a condition thereof requiring the raising of an additional sum
for the same purpose.

9. Read with the context, the words "all things of mechanical or
other technical work" refer to such things as were being or
might properly be taught in a modern manual training school
maintained at public expense; and no particular significance
should be attached to the reference to the deceased husband's
wish to found an "institution" of learning.

10. A condition of a testamentary gift to found and maintain a
school, that it shall bear the name of the deceased husband of
testatrix, may lawfully be complied with by a city.

11. A testamentary gift to found and maintain a manual training
school in a city was made upon condition that an additional
$50,000 for that purpose be raised by or for the city. The will
directed that the whole fund, except so much as might be nec-
essary to purchase a site and erect suitable buildings, and the
income thereof should be a perpetual fund to be used to provide,
support, and maintain such school. The testatrix intended that
the school should be a memorial to her deceased husband, and
stipulated that a substantial building be constructed and
equipped with modern appliances, placing no restriction upon
the amount which should be expended therefor. *Held*, that by
raising the $50,000 and expending the whole thereof for a build-
ing and equipment for the school the city would substantially
comply with the requirements of the will, and thereby obviate
the objection that the city had no power to raise a fund to be
invested in perpetuity for such a purpose.

12. Where a gift to a city in aid of some municipal purpose is made
on condition that the city itself make a contribution for that
purpose, the city may do so, provided it might lawfully make
such expenditure had no gift been made.

13. Property devoted to a charitable use, where a trust is created,
must, if the gift is accepted, be irrevocably devoted to such use,
and, in case of any attempted diversion, equity will intervene
and, if necessary, name a new trustee to carry out the purpose
of the trust.

14. The term "perpetuity," as applied to charitable trusts, retains its
original meaning of an inalienable and indestructible interest,

subject, however, to unforeseen social changes or eventualities preventing the continued existence of the trust.

15. A city may lawfully contribute funds to aid in the construction of a public school building provided for in part by a gift made under such circumstances as to create a trust in perpetuity and therefore requiring the permanent maintenance of the school.

16. The ward schools of a city are "district" schools within the meaning of sec. 3, art. X, Const., and whatever may lawfully be taught in such schools must be taught without the exaction of tuition fees from resident children of school age.

17. Every will should, as far as possible, be interpreted from the standpoint of testator, and attendant circumstances, such as the condition of his family and the amount and character of his property, should be taken into consideration as part of the *res gestœ*, when the language is not plain nor the meaning obvious.

18. It is the duty of the courts to uphold charitable bequests if it can be done without violating any provision of statute or principle of law.

19. A will which gave property to a city to found and maintain a manual training school, upon condition that an additional sum for the same purpose be raised by or for the city and that a tuition fee should be charged which in the judgment of the city should be sufficient, together with the income of the fund provided, to perpetually properly maintain the school, is construed, in the light of all the circumstances, as showing that it was the intention of the testatrix that tuition fees should be charged only to those pupils from whom the city might lawfully exact such fees (*i. e.* nonresident pupils and those over school age), and that the city might therefore lawfully comply with such condition.

20. The action of a city in raising and appropriating money to build a manual training school was not void, although induced by a conditional testamentary gift for such a school, where the testatrix was actuated by no ulterior motive in making the gift and neither she nor her family could reap any material benefit therefrom.

21. The city charter of Oshkosh (sec. 6, subch. XI, ch. 59, Laws of 1891), providing that no school building shall be constructed until the plans therefor have been adopted and approved by the board of education, does not make the adoption of plans a condition precedent to the right of the city to vote bonds to raise money for the erection of a school building.

22. Although the city charter (sec. 7, subch. XI, ch. 59, Laws of 1891) required the city treasurer to keep all moneys raised for school

purposes as a separate fund and disburse the same only on the orders of the board of education, a formal tender of money raised by the sale of bonds to erect a building for a manual training school, made by the city to the trustees of a testamentary gift for such school conditioned upon the city raising the sum tendered, did not vitiate the bonds or create an unlawful diversion of the money, the tender being made merely to satisfy said trustees that the condition had been complied with, and the city thereupon becoming entitled to receive the gift as trustee and to hold and expend both it and the proceeds of the bonds for said school, and there being nothing to show that the city does not in good faith intend to expend said proceeds in erecting the building.

23. Sec. 926—11, Stats. (Supp. 1906: Laws of 1903, chs. 228, 428), providing that no bonds shall be issued by a city unless the council shall provide for a direct annual tax "sufficient to pay the interest thereon," etc., does not require an exact statement of the amount which is to be levied annually; and an ordinance providing for the levy of a tax to pay interest on a certain amount of bonds at a rate "not to exceed four per cent. per annum" is sufficiently definite and certain where the bonds issued in fact bear four per cent.

24. Bonds headed "Manual Training School Bond of the City of Oshkosh" and reciting in the body thereof that they are issued "for the purpose of erecting, constructing, and maintaining a manual training school building in and for the city," sufficiently comply with the requirement of said sec. 926—11 that such bonds shall "bear an appropriate name indicating the purpose of their issue."

25. Under the authority given by said sec. 926—11 to issue bonds "for the erection, construction, and *completion* of school buildings," bonds may be issued to build and *equip* a school building; such a building not being *complete*, within the meaning of the statute, until equipped.

APPEALS from an order and a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Affirmed.*

On December 31, 1907, Helen A. Beach, a resident of the city of *Oshkosh,* died leaving a will, which was thereafter duly admitted to probate. The twentieth paragraph of such will reads as follows:

"It was the desire of my husband, Orville Beach, as expressed to me in the later years of his life, that after making

provision for his relatives and those having a claim upon his bounty the remainder of his property should be given to the city of *Oshkosh,* Wisconsin, in trust, for the purpose of founding an institution in this city in which the coming generations might be taught sound business principles, be fitted for manufacturing and business careers, and domestic duties. On or about the 25th day of August, 1900, my husband began the preparation of a will, but owing to the fact that he had not decided upon the exact form of such charity, at the time of his death the same instrument was uncompleted.

"To carry out the known wishes and desires of my said husband, I give, devise and bequeath to Charles Schriber and George Hilton, of the city of *Oshkosh,* Wisconsin, and to their successors in trust all the rest, residue and remainder of my property, real, personal and mixed, wheresoever located, to have and to hold the same in trust for the uses and purposes following, to wit: Founding, preparing, constructing and maintaining perpetually a manual training school, with the appurtenances and all things appertaining thereto, and the necessary buildings and premises, and with the necessary appurtenances and equipments, in the city of *Oshkosh,* Winnebago county, Wisconsin. The object of the school to be the teaching of cooking, sewing and household economy to girls, and the teaching of all things of mechanical and other technical work to young men, and to teach to both girls and boys such things as are usually taught in modern manual training schools, and to teach such things as the progress of time develops should and ought to be taught in a manual training school; but this gift, grant, devise and bequest is made upon the express condition that within three (3) years after my decease, the said city of *Oshkosh,* the citizens thereof or other persons or parties or any or either or all thereof, shall raise, grant, give and donate to the city of *Oshkosh,* Wisconsin, for the purposes aforesaid, the sum of fifty thousand dollars ($50,000), when said sum of fifty thousand dollars ($50,000) shall be so raised and donated as aforesaid to the said city of *Oshkosh,* then all the rest, residue and remainder of my estate, of every name and nature, so given to my said trustees, together with all additions thereto and increase thereof, shall be conveyed, assigned, transferred and set over absolutely, by my said trustees, by necessary and proper instrument of transfer to the said city of *Oshkosh,* or any lawful trustees by said

city of *Oshkosh,* lawfully selected, the whole of such fund (except so much thereof as may be necessary to purchase a suitable site and to erect suitable buildings for such manual training school) and the income thereof shall be a perpetual fund, to be used and enjoyed by the said city of *Oshkosh,* or trustees aforesaid, perpetually, to provide, support and maintain a manual training school with all the appurtenances and equipment appertaining thereto, in the said city of *Oshkosh,* Wisconsin.    This gift, grant, devise and bequest is made upon the further express condition that the said school shall be named and perpetually known as the Orville Beach Memorial Manual Training School of the city of *Oshkosh,* and that a tuition fee shall be charged, which in the judgment of the city of *Oshkosh,* or trustees appointed by the said city of *Oshkosh,* shall be sufficient, together with the income of the aforesaid fund, to perpetually properly maintain said school.

"My said trustees shall forthwith, upon my decease, convert all of my real estate into personal property, and it is my intention that for the purpose of the construction of this gift and donation, all of my property shall be deemed in law personal property.

"My said executors are hereby authorized and empowered to bargain, grant and convey any and all real estate that I may own at the time of my decease, and to make, execute and acknowledge the forms of conveyance necessary in that behalf, with or without covenants of warranty.

"If either of my aforesaid trustees shall refuse to act, resign, die or become incapacitated to act, all the provisions, rights and authority hereby conferred and imposed upon my trustees shall survive, belong and be imposed upon the survivor thereof with full power and authority in the premises. If, by refusal, death, resignation or incapacity to act, there shall be a vacancy as to all of said trustees, or none to act, the circuit court of Winnebago county, Wisconsin, shall have power to appoint and select a trustee or trustees to follow, carry out and execute the aforesaid provisions of this will, as aforesaid.

"This gift, grant, donation, devise and bequest shall not be vitiated, null or void, because the said city of *Oshkosh,* Wisconsin, at the time of my decease, shall not have the power to accept or carry out the said donation, if it shall acquire or ob-

tain such power within three years after my decease, and before the transfer is made by said trustees of said property and the income as aforesaid.   The said city of *Oshkosh* shall be responsible for the faithful execution of said trust and property, proceeds, fund and income hereby donated, and may, if deemed advisable, execute and carry out the same by trustees legally selected, but the city of *Oshkosh* shall be responsible for the acts of said trustees.

"Before my said trustees shall so transfer said property, proceeds, income and increase as aforesaid, the said city of *Oshkosh,* by resolution or ordinance of its common council by a vote of a majority of all its members, shall accept and agree faithfully to carry out and execute the conditions hereof and of said trust.

"It is my desire that said manual training school building shall be of a substantial nature and character and shall be constructed of Lake Superior brown stone or other stone of equal quality.

"My said trustees are hereby authorized and empowered during said three years, or until said sum of fifty thousand dollars ($50,000) shall have been raised and donated as aforesaid, to invest the property hereby given them in trust as they may deem best.

"In case of failure to raise the sum of fifty thousand dollars ($50,000) as aforesaid, within three years, then and in that case the said property and the whole thereof is to be paid, transferred and assigned absolutely to Clayton W. Finch of Port Chester, New York, Charles T. Beach of Sandy Hill, New York, Charles B. Cole of the city of *Oshkosh,* Wisconsin, Kathryn Cool of Saratoga Springs, New York, and Louis B. Thompson of New York City, and to their heirs and assigns absolutely and forever, in equal shares, to each one-fifth (1-5) thereof."

After paying the debts and specific legacies provided for in the will, the residue of the estate to be devoted to the purposes provided for in the twentieth paragraph of the will amounts to between $130,000 and $135,000.   The common council of the city of *Oshkosh* passed a resolution accepting the gift and the terms under which it was made, and issued

and sold its bonds to the amount of $50,000 to provide the nec-
essary funds to make the gift available to the city.    The plaint-
iff brings this action as a taxpayer, in his own behalf as well
as in behalf of taxpayers generally, to restrain the city of *Osh-
kosh* from issuing or selling bonds to make up the fund of
$50,000 provided for in the will of Mrs. Beach, and also to
restrain the city from using the proceeds of any bonds that
might be sold for any such purpose.    Application was made
to the court for a preliminary injunction restraining the de-
fendant from selling or negotiating the bonds until the suit
was finally determined.    The court denied relief by way of a
preliminary injunction.    The case was tried on its merits,
and judgment was rendered in favor of the defendants dis-
missing the complaint.    From such judgment and from the
order refusing a temporary injunction the plaintiff appeals.

The cause was argued October 31, 1910, and upon sug-
gestion by the court was reargued on November 21, 1910.

For the appellant there were briefs by *C. D. Jackson,*
*J. C. Thompson,* and *A. E. Thompson,* attorneys, and
*E. M. Smart,* of counsel, all of whom participated in the oral
argument except *Mr. Jackson.*

For the respondents there were briefs by *Fred Beglinger,*
city attorney, and *Charles Barber* and *George Hilton,* of coun-
sel, and oral argument by *Mr. Beglinger* and *Mr. Barber.*
On the reargument *Mr. Hilton* also argued orally.


BARNES, J.    The questions presented on this appeal are
numerous and important and some of them are fraught with
difficulties.    The briefs filed with us contain over 550 pages
of printed matter.    Two days were consumed on the argu-
ment, and on a reargument of the case which was ordered, and
if the court is not sufficiently informed to reach a correct con-
clusion it is not the fault of the counsel in the case, who from
their respective standpoints have displayed commendable dili-
gence and learning in presenting to the court the facts and the

law involved.    The appellant contends that the judgment and
order appealed from should be reversed on the following
grounds:

(1) The will created a charitable trust and must be con-
strued with reference to the duties, obligations, and liabilities
surrounding such trust and imposed on the trustees thereof,
and the city could not act as trustee of the trust attempted to
be created.

(2) The will did not contemplate the erection of such a
school building and the maintenance of such a school as the city
of *Oshkosh* was authorized by law to build or maintain, and
therefore the taxpayers could not be compelled to contribute
any part of the fund provided for by the will.

(3) The city of *Oshkosh* had no power to enter into an
agreement to permanently maintain the school or to perpet-
ually carry out the terms of the trust.

(4) It is beyond the power of the city of *Oshkosh* to raise
money by taxation for the purpose of creating a fund, out of
the earnings of which the school will in the future be sup-
ported in part at least.

(5) The will required the exaction of a tuition fee from
pupils attending the school, and the city has no legal authority
to raise money by taxation to support such a school.

(6) The trust created is void on the ground of public pol-
icy.

(7) The bonds involved in this suit are illegal for the
following additional reasons: (a) Because no plans for the
school building had been prepared and submitted to the board
of education and approved by that board, as required by the
city charter, before the bonds were voted; (b) because the city
charter requires the city treasurer to keep all moneys raised for
school purposes in a separate fund and to disburse the same on
the order of the board of education, while it was not intended
that the money received from the sale of these bonds should be
so kept or so disbursed; (c) because no legal tax levy was made

by the common council to meet the interest on the bonds as it fell due; (d) because the bonds are not appropriately named to indicate the purpose for which they were issued; (e) because the bonds were voted for constructing and equipping a manual training school, and the council had no authority to 'vote bonds for the purpose of *equipping* a school building.

1. The first question to be determined is the nature of the bequest. The plaintiff contends that it was the intention of the testatrix to create a charitable trust. The defendant maintains that it was the intention of Mrs. Beach to place the absolute title of her property in the city, when certain conditions were complied with, unfettered by any trust, and that in the event of a diversion of the fund any person in interest might proceed to secure appropriate redress in the courts as for a condition broken. In support of this view the case of *Danforth v. Oshkosh,* 119 Wis. 262, 97 N. W. 258, is cited, as well as other cases. If this view be correct, it eliminates some difficulties that arise in case it be held that a charitable trust is created.

The will before us follows quite closely the provisions of the will of Mrs. Harris, involved in the *Danforth Case,* in so far as the creation of a trust is concerned. The only material difference between the provisions of the two wills in this regard is found in the clause of the will of Mrs. Harris which provides that, in case of a diversion of the property or fund donated to any purpose other than that contemplated by the will, there should be a reversion to the heirs of the testatrix and those of her deceased husband. The court reached the conclusion that no trust was created and that the title passed charged only with a condition subsequent. In the will of Mrs. Beach there is no express provision for a reverter in the event of a diversion of the fund, and none can be implied under the law of this state. *Strong v. Doty,* 32 Wis. 381; *Thorndike v. Milwaukee A. Co.* 143 Wis. 1, 12, 126 N. ,W. 881.

There are many provisions in the will under consideration which indicate an intention on the part of the testatrix to create a public charitable trust. It recites that it was the intention of the husband of the testatrix that the property bequeathed should be given to the city of *Oshkosh in trust,* and that the will was made for the purpose of carrying out such intention. The property is given to the trustees named in the will *to be held in trust* for the purpose of building and *perpetually* maintaining a manual training school. The balance left after the building was built and equipped was to constitute a *perpetual fund* to be used by the city in maintaining the school. The school was to be *perpetually* known as the Orville Beach Memorial Manual Training School. Tuition fees in a sufficient amount should be exacted, which, added to the income from the fund, would *perpetually* maintain the school. There is no provision for a reverter in case of a violation of any or all of these provisions. It seems highly improbable that the testatrix had in mind the giving of this splendid donation in such a way that it might be dissipated or disposed of for any purpose which the city saw fit as soon as it came into possession of the property. It is likewise improbable that the donation would have been made had the donor understood that any such result could legally follow. Persons making wills are not obliged to donate money to charitable uses. When they do, they have the right to devote it to any legitimate charity they see fit and to generally prescribe the conditions under which the donation is made. When those conditions are accepted there is a binding obligation that may be enforced through the courts. 2 Perry, Trusts, § 733 and cases cited. No great amount of formality in the use of language is necessary in order to create a public charitable trust. The courts look to the purpose for which the gift was made. In order to create such a trust there must be some public benefit open to a vague and indefinite number of persons until they are selected or appointed to be the particular beneficiaries of the

trust for the time being.   2 Perry, Trusts, §§ 687, 710;
*Dodge v. Williams,* 46 Wis. 70, 97, 98, 1 N. W. 92, 50 N.
W. 1103 ; *Harrington v. Pier,* 105 Wis. 485, 505, 514, 82 N.
W. 345 ; *Sawtelle v. Witham,* 94 Wis. 412, 69 N. W. 72.
Gifts to institutions of learning and for educational purposes
are almost invariably held to be gifts for charitable purposes.
2 Perry, Trusts, § 700, and cases cited; *Dodge v. Williams,
supra.*   So we conclude here that it was the intention of the
testatrix to create a charitable trust, public in its character,
and that the will must stand or fall on such interpretation of
its terms.

That a city may become the trustee of a charitable trust,
where the donation is made to aid some public purpose char-
itable in its nature which it is the legal duty of the city to sup-
port and provide for, does not admit of doubt.   When the
trust is accepted the city assumes the same obligations and be-
comes amenable to the same regulations that apply to other
trustees of such trusts, and among them is the obligation to
perpetually administer the charitable fund in accordance with
the expressed wish of the testator.   *Thorndike v. Milwau-
kee A. Co.* 143 Wis. 1, 126 N. W. 881; *Beurhaus v. Cole,* 94
Wis. 617, 69 N. W. 986; *Philadelphia v. Girard's Heirs,* 45
Pa. St. 1, 25 ; *Vidal v. Girard's Ex'rs,* 2 How. 127, 180, 190 ;
*McDonogh's Ex'rs v. Murdock,* 15 How. 367 ; *Webb v.
Neal,* 5 Allen, 575 ; *McIntire Poor School v. Zanesville C. &
Mfg. Co.* 9 Ohio, 203 ; *First Parish v. Cole,* 3 Pick. 232 ;
*Comm'rs v. McPherson,* 1 Speers (S. C.) 218 ; *Governor v.
Gridley,* Walk. (Miss.) 328 ; *Carmichael v. Trustees,* 3 How.
(Miss.) 84 ; *Phillips v. Harrow,* 93 Iowa, 92, 61 N. W. 434 ;
*Quincy v. Att'y Gen.* 160 Mass. 431, 35 N. E. 1066 ; *Cham-
bers v. St. Louis,* 29 Mo. 543 ; *Delaney v. Salina,* 34 Kan.
532 ; *Maynard v. Woodard,* 36 Mich. 423 ; 2 Dillon, Mun.
Corp. (4th ed.) § 567; *Higginson v. Turner,* 171 Mass. 586,
51 N. E. 172.   In so far as the will before us enjoins on the
city the duty of perpetual maintenance, it imposes no obliga-

tion which the law would not impose had the will been silent on the subject, if a charitable trust otherwise valid has been created.    Such being the case, the requirement is innocuous and cannot affect the validity of the will.    *Sheldon v. Stockbridge,* 67 Vt. 299, 31 Atl. 414.

2.  Having reached the conclusion that a charitable trust was intended to be created, we now come to a consideration of the specific clauses of the will which it is asserted render it impossible to carry out the scheme of the testatrix.    In the first place it is urged that the will contemplates the founding of such a school or institution of learning as the city of *Oshkosh* has no power to maintain, and therefore it cannot raise money by taxation to aid in the enterprise.    In this connection it may as well be said now as later that it is the opinion of the court that unless the city has the right to maintain such a school as is provided for, as part of its general system of education, it has no right to vote the bonds involved in this suit.

Sec. 496*b*, Stats. (1898), provides that "any board having charge of a free high school or of a high school having a course of study equivalent to the course or courses prescribed by the state superintendent for such schools may establish and maintain a department of manual training in connection with the school under its management."    This statute was amended by ch. 503, Laws of 1907, so as to permit manual training to be taught to the pupils in "the three upper grades next below the high school."

The charter of the city of *Oshkosh* (Laws of 1891, ch. 59, subch. XI, sec. 4) is broader in its terms than is the general law.    It authorizes the board of education "to establish and organize such high schools and so many district schools and branches of the same, primary schools, night schools, schools of manual training and kindergartens as they may deem expedient."    This provision was enacted in 1891.

Under this provision it is clear that the city has the power

to erect one or more buildings to be used exclusively for the purpose of teaching manual training, and that the city may maintain such a school for the benefit of all pupils of school age, as well as for the benefit of all persons whom it may have the right to admit to any of its public schools. As a matter of fact, the city, acting under its charter, has provided instruction in manual training to all pupils attending its public schools, at an expense of five or six thousand dollars per year. For a time it afforded such instruction to children who attended the parochial schools of the city, such instruction being given in the public schools however. The practice was discontinued for lack of accommodations.

It is apparent that the term "manual training" may have a broad significance or it may be correctly applied to instruction in a very few simple things. Neither the general statute nor the charter of the defendant undertakes to say how little or how much may or must be taught on the subject. This is wisely left to the discretion of the school authorities, and, this being so, we would expect to find a wide variance in the kind of instruction given and the extent to which it is carried on in the various schools in the state in which the subject is taught. Indeed, it may be wise administration to direct the activities of boys along different lines in a school located in a factory district, from those which might be pursued in a school surrounded by different environments. The matter of teaching manual training in the public schools of this country is comparatively new and seems to embrace some of the ideas of the trade school which has accomplished much in some European countries. The idea is presently in a state of evolution with large possibilities before it. It has been carried on in some portions of the country for forty years and in some of the schools of this state for about twenty-five years, and the number of schools giving instruction in it is gradually increasing. So the innovation cannot be called a fad and therefore liable to be discontinued. Manual training has been taught

in the *Oshkosh* schools for thirteen years. It would seem to be a very practical and useful course of instruction, at least as much so as many branches of education that are taught in. our common schools.

It now behooves us to ascertain whether the school provided for by Mrs. Beach is such a school as the city of *Oshkosh* has· the right to maintain at public expense. There is some broad. general language used in reference to the character of the· school which she had in mind. She says it was the purpose of her husband to found an *institution* wherein sound busi-- ness principles might be taught and where pupils might be fitted for manufacturing and business careers. To carry out the wishes of her husband she makes the donation for the pur- pose of preparing, constructing, and maintaining a *manual* *training* school. She says that the object of such school shall. be to teach cooking, sewing, and domestic economy to girls, and "all things of mechanical and other technical work to young men, and to teach to both girls and boys *such things as· are usually taught in modern manual training schools, and to teach such things as the progress of time develops ought to be taught in a manual training school."* If the words "all things of mechanical or other technical work" be segregated from the rest of the sentence in which they are used, they might be interpreted as indicating an intent on the part of the testatrix to found a school at which civil, mechanical, elec- trical, and mining engineering would be taught, as well as other technical subjects in which instruction is given only in. our higher institutions of learning, and which cannot be suc- cessfully taught without a large outlay for equipment, and cannot be profitably taught to students of immature years or to those not having the equivalent of a high school education. We do not think that this is the kind of a school the testatrix had in mind. She wanted a school which all should be per- mitted to attend and to derive benefit from and where the many could be fitted for "manufacturing and business careers,"

rather than that the few should become experts along technical lines.   We must assume that when she speaks of a manual training school she refers to such a school as the term ordinarily implies.   She has herself designated the institution as a "manual training school," and said that such things should be taught there as are usually taught in such schools, and that the school should keep pace with the development and enlargement of the course of instruction in such schools.   Reading the entire paragraph, we think that the words "all things of mechanical and other technical work" were intended to refer to such things as were being taught or might properly be taught in a modern manual training school maintained at public expense.   We do not think any particular significance can be attached to the fact that the testatrix speaks of the intent of her husband to found an "institution" of learning or that it is to be named the Orville Beach Memorial Manual Training School.   A separate building was contemplated by the will.   The city has a right to construct and maintain such a building and to devote it exclusively to manual training. When maintained it becomes an "institution of learning," else the city would have no right to maintain it at all.   It is a very common practice for cities at the present time to name their schools after distinguished citizens who might or might not have been residents thereof.   If the testatrix here desired to perpetuate the name of her husband in the manner stated in the will, she has amply requited the city for the small privilege demanded, and we perceive no good reason why the city may not comply with her wishes in this behalf.   It has been expressly held that such a requirement may be lawfully made and lawfully complied with.   *Jones v. Habersham,* 13 Fed. Cas. 957 (3 Woods, 443), affirmed in 107 U. S. 174; *Phillips v. Harrow,* 93 Iowa, 92, 61 N. W. 434.

3. It is urged that the donation made by the testatrix, together with the $50,000 which the city proposes to raise, must be mingled as a common fund out of which a site is to be pur-

chased and a building is to be erected and equipped, and the balance of which is to be so invested as to produce an income to be used for the purpose of maintaining the school, and that the city of *Oshkosh* has no power to raise a fund to be invested in perpetuity for such a purpose. .

There is much force in this contention, and the city evidently appreciated this fact and has attempted to avoid the effect of it by raising the $50,000 for the express purpose of building and equipping the school. Independent of any donation, manifestly the city had a right to vote bonds for this purpose. The question is, Has the city by so doing complied with the requirements of the will? The city cannot divert funds raised for a lawful purpose to one which it has no right to raise money for by taxation. The proceeds of the bonds must be used for the purpose for which they were voted. If such use of the money does not satisfy the conditions of the will, then the bequest cannot be sustained, if we assume that a taxpayer has the right to raise the objection. An important question, therefore, is whether the city has in fact complied with the requirements of the will.

In this connection it is proper to observe that the testatrix intended that the school should be erected as a memorial to her husband; that she stipulated that a substantial, modern, up-to-date building be constructed, preferably of Lake Superior brown stone; that she desired that such school should be equipped with modern, up-to-date appliances so that manual training could be taught to the best advantage; that she placed no restriction upon the city in reference to the amount of money that might be invested in the school building and in its equipment; that the city has under the terms of the will the absolute right to invest $50,000 in the building and equipment; that we must presume that the city in good faith intends to do so; and, finally, that the testatrix was presumed to know the law and to know what were the legal rights of the city. The city by using the money raised by it for the

purpose of erecting and equipping the school building may
not be technically complying with the expressed wish of the
testatrix, but it is certainly complying with her wish in sub-
stance and effect, and it would be extremely technical to hold
under such circumstances that the city forfeited its right to
receive the donation.    Every purpose which the testatrix had
in mind will be carried into full effect by the city using the
fund raised by it to build and equip the school building.

It is suggested rather than argued that the city had no
right to contribute to such a fund in any case.    But it is set-
tled in *Danforth v. Oshkosh,* 119 Wis. 262, 97 N. W. 258,
that, where a donation is tendered to a municipality in aid of
some municipal purpose for which it is authorized to expend
money on condition that the municipality itself make a con-
tribution in aid of the purpose of the donor, it may do so, pro-
vided the lawful right existed to make the expenditure had no
donation been made.    The cases cited elsewhere in the opin-
ion amply support this view.

4. It is further urged that, a trust in perpetuity being cre-
ated by the will, the property devoted to the charitable use must
always be applied to such use, and that it is beyond the power
of the city of *Oshkosh* to raise money to build a manual train-
ing school which must be forever maintained as such.    This
contention raises one of the most difficult questions in the case.
The general rule of law is that money or property devoted to
a charitable use, where a trust is created, must, if the gift is
accepted, be irrevocably devoted to such use, and that in case
of attempted diversion a court of equity will intervene, and if
necessary name a new trustee to carry out the objects and pur-
poses of the trust.    In other words, the term "perpetuity" as
applied to charitable trusts has retained its original signifi-
cance, in that it means an inalienable and indestructible in-
terest.    Generally speaking, any limitation that suspends the
power of alienation beyond the period allowed by law creates
a perpetuity, but we are not dealing with a perpetuity of this
kind.

However, this general language in reference to the meaning of a perpetuity as applied to a charitable trust cannot be taken too literally.    Otherwise charitable trusts could not be created at all, and it cannot be doubted that the city of *Oshkosh* could become the trustee of such a trust.    No one is wise enough to say what social changes the mutations of time may bring about or what political or other cataclysms the future may witness.    The city of *Oshkosh* may be destroyed by an earthquake or become a lake or a desert.    It may go the way of Nineveh and Tyre, and exist as a remembrance only to remote generations.    But, notwithstanding the fact that such eventualities may occur, it can still become the trustee of a charitable trust.    The courts deal with practical situations and ordinarily pay little heed to remote contingencies.    We must presume that the city of *Oshkosh* will live and thrive and that the system of free district schools guaranteed by the constitution will be maintained therein.    We must also presume that instruction in the languages, in mathematics, and in other subjects now taught therein, will be continued.    The tendency of the times is to enlarge the school curriculum instead of reducing it.    It is fair to assume that any branch of knowledge that has been firmly engrafted in our system of education has come to stay, and there is nothing in the record to indicate that manual training in our public schools has not come to stay.    Of course laws may be passed in the future that will prohibit the teaching of manual training, but the testatrix knew of this possibility when she made her gift and was willing to take the chances.    So we are called upon to say whether the city may, by accepting this gift, bind itself to do what in all human probability it would do if no gift had been made; that is, to maintain a public school system and teach manual training as part of its general system of education.    Mrs. Beach knew when she made her will that the school building she was providing for might not and in fact could not endure for all time.    Fire might destroy it, and, if it did not, time would disintegrate it and render it unfit for use.    Conditions

might demand that a newer, more commodious, and more modern building should be constructed at some time in the future, even before the building provided for had ceased to be serviceable. All the city will have to do to comply with the terms of the will will be to place such a memorial tablet in the new building as was placed in the old, and carry on a system of instruction therein in harmony with the expressed wish of the testatrix. There is the possibility that the city of *Oshkosh* will become atrophied and fall into such a state of decay that it will not or cannot maintain a public school system. But here again we have the remote possibility only, and if decay must come its progress will, to some extent at least, be retarded by the income derived from this donation. Public moneys invested in school buildings and grounds are in substance and effect invested in perpetuity. School buildings may outlive their usefulness and become obsolete, but they are usually replaced by other and more costly, more pretentious, more substantial, and more modern structures. Various causes may render it advisable to erect a new building on a different site from that occupied by the old one, but the proceeds derived from the sale of the old site is reinvested in the new site and building, and generally a great deal more. The matter of making donations of the general character of the one made here is not uncommon, and as wealth accumulates there is reason to believe that their number will increase. Most persons making such gifts have well-defined ideas as to the purpose to which they desire their money to be put. Stability above all things is an end desired by donors. The undertaking of the city of *Oshkosh* to perpetually maintain this school is not contrary to the letter of the law. At best it can only be said that there is no positive statute authorizing the city to enter into such an undertaking where its money is invested in the school. If the city had none of its own funds invested in the building, it could beyond question enter into the obligation, because it could act as trustee of a fund do-

nated for a charitable purpose which was at the same time a municipal one, and the agreement to perpetually maintain would add nothing to the obligation which the law imposes on the trustee in the absence of an express agreement. By the city saying that it will perpetually maintain the school in question, it is saying that it will do the thing which it would do had no promise been exacted, so long as it maintains a public school system. If it does so, then it has maintained the school in perpetuity within the meaning of the law. The investment of public moneys in the building of schools being of a perpetual character, we think it is no violation of the spirit of the law to hold that a city may contribute funds to aid in the construction of a public school building provided for in part by a gift made under such circumstances as to create a trust in perpetuity, and therefore requiring the permanent maintenance of the school. When the city of *Oshkosh* accepted its charter it subjected itself to the burdens imposed by the constitution. One of those burdens was the maintenance of a system of district schools in which education should be free to all pupils of school age, so long as the city existed and so long as the provision of the constitution survived; or, in other words, in perpetuity. To carry out this obligation school buildings must be maintained in perpetuity. The assumption of the duty of teaching manual training in a separate building is entirely in harmony with the constitutional requirement.

The conclusion reached is not without support in the adjudicated cases, as will be seen by a reference to the following: *Piper v. Moulton,* 72 Me. 155; *Drury v. Natick,* 10 Allen, 169; *Budd v. Budd,* 59 Fed. 735; *School Trustees v. Hoboken,* 70 N. J. Eq. 630, 62 Atl. 1; *Kelley v. Kennard,* 60 N. H. 1; *East Tenn. Univ. v. Knoxville,* 65 Tenn. 166.

5. The will provides that "a tuition fee shall be charged, which in the judgment of the city of *Oshkosh,* or trustees appointed by said city of *Oshkosh,* shall be sufficient, together

with the income of the aforesaid fund, to perpetually properly maintain said school," and it is urged with much force that the city cannot contribute the money of its taxpayers to maintain a school in which tuition is charged. In fact, this is the proposition to which the appellant's counsel devoted the most attention in their briefs and in their first oral arguments of the cause.

It must be conceded that the testatrix intended to donate her property to a school that would at least be open to all children of school age. That the ward schools of the city of *Oshkosh* are "district" schools within the meaning of sec. 3, art. X, of the constitution, does not admit of doubt. Further than this it is unnecessary to go. That the testatrix intended that pupils in the ward schools of the city should have the benefit of the manual training school seems equally clear. The provision of the constitution above referred to requires the legislature to provide for the establishment of district schools, and that "such schools shall be free and without charge for tuition to all children between the ages of four and twenty years." This requirement should not be restricted by construction. Whatever may lawfully be taught in such a school is part of the curriculum therein, and the fact that the teaching of manual training is not made compulsory by law does not alter the fact that when it is taught it becomes part of the curriculum. The pupil in a district school is just as much entitled to have manual training taught him without the exaction of a charge, if it be taught at all, as he is to have mathematics taught without being obliged to pay therefor. Besides, the city of *Oshkosh* is not authorized by any law to charge tuition in any kind of a school which it is empowered to maintain, and we do not wish to be understood as intimating that it could be so authorized. Unless this will can reasonably be interpreted as meaning that a tuition charge need not be exacted of all pupils, or unless this provision of the will may be rejected, it cannot be sustained. So we proceed to ascertain what the testatrix intended, as well as we may.

The intention of the testatrix must be gathered from the whole will taken together, and not from detached portions of it alone. *Lane v. Vick,* 3 How. 464; *Cook v. Weaver,* 12 Ga. 47; *Jackson v. Hoover,* 26 Ind. 511; *Parker v. Wasley's Ex'r,* 9 Grat. 477; *Hoxie v. Hoxie,* 7 Paige, 187; *Nightingale v. Sheldon,* 5 Mason, 336; *Jackson v. Kip,* 2 Paine, 366; 2 Jarman, Wills, 840.

The struggle in such a case, as Mr. Justice STORY observes, "is to accomplish the real objects of the testator, so far as they can be accomplished, consistently with the principles of law; but in no case to exceed his intention fairly deducible from the very words of the will." *Nightingale v. Sheldon, supra.*

The intention of the testator, as expressed in his will, governs; and this intention must be discerned through the words of the will itself as applied to the subject matter and the surrounding circumstances. *In re Donges's Estate,* 103 Wis. 497, 79 N. W. 786; Schouler, Wills (2d ed.) § 466, p. 500; 1 Redf. Wills, 433; 2 Jarman, Wills, 838; *Parsons v. Winslow,* 6 Mass. 169, 175; *Chrystie v. Phyfe,* 19 N. Y. 344; *Williamson v. Williamson,* 57 N. C. 281.

Every will should as far as possible be interpreted from the standpoint of the testator, and attendant circumstances, such as the condition of his family and the amount and character of his property, may and ought to be taken into consideration as part of the *res gestæ* when the language is not plain nor the meaning obvious. Schouler, Wills, *supra; Smith v. Bell,* 6 Pet. 68; *Blake v. Hawkins,* 98 U. S. 315; *Brown v. Thorndike,* 15 Pick. 388; *Postlethwaite's Appeal,* 68 Pa. St. 477; *Perry v. Hunter,* 2 R. I. 80, 81; *Brown v. Bartlett,* 58 N. H. 511; *In re Donges's Estate, supra.*

Where the language used in a will is reasonably susceptible of two different constructions, one of which will defeat and the other sustain the provisions, the doubt is to be resolved in favor of the construction which will give effect to the will, rather than the one which will defeat it. *In re Donges's Estate,* 103 Wis. 497, 501, 79 N. W. 786.

While devises and bequests may be void upon many grounds, "it is the policy of the law not to seek grounds to avoid either; but so to deal with both, if it can be done upon sound legal construction, as to uphold and enforce them." It is the duty of the courts to uphold charitable bequests if it can be done without violating any provision of statute or principle of law. "At the same time it is the duty of the court carefully to weigh the objections made against the bequests, and to give effect to any sufficient to render the bequests void in law." *Dodge v. Williams,* 46 Wis. 70, 91, 1 N. W. 92, 50 N. W. 1103.

"Courts here, as anciently, look with favor upon all donations to charitable uses, and give effect to them where it is possible to do so consistent with rules of law, and to that end the most liberal rules the nature of the case will admit of, within the limits of ordinary chancery jurisdiction, will be resorted to if necessary." *Harrington v. Pier,* 105 Wis. 485, 503, 504, 82 N. W. 345.

There are two classes of pupils who may attend this manual training school from whom a tuition fee can legally be exacted, to wit, nonresidents and those over school age, and it remains to be seen whether the will can reasonably be so construed as to warrant the conclusion that the testatrix intended that only the pupils falling within such classes should be charged.

Construing the tuition clause in the light of the circumstances which surrounded the testatrix when she made her will, we have about this situation: We should presume that the testatrix knew the law; we must presume that she intended to make a valid will. The testatrix had no children of her own and her husband was dead. The husband himself had in contemplation the founding of this training school, but he died before he carried out his purpose. The testatrix provided for the establishment of this school to comply with the wishes of her deceased husband as well as her own. The rela-

tives of the testatrix, and those of her husband, for the most
part lived in distant states, and seem to have been quite liber-
ally remembered in her will; and, finally, the testatrix was
making the gift to a trustee that was presently teaching man-
ual training in its schools, and that had the right to supple-
ment the income from the trust fund by moneys raised by tax-
ation.

We have a class of pupils to whom tuition may be lawfully
charged; very strong circumstances indicating an intent on
the part of the testatrix to make a valid will; and the legal
presumption that the testatrix knew the law.   The question
is, Can the court under these circumstances say that the testa-
trix intended that tuition fees should be charged only to those
pupils attending the manual training school from whom tui-
tion could lawfully be exacted, and can the will be reasonably
construed as expressing such intent, read in the light of the
circumstances which surrounded the testatrix when the will
was made ?   If a construction can be adopted which will
render the will valid, without doing violence to its language,
it is, under the rules of construction referred to, to be pre-
ferred to the one which will render it void.

The case presenting the closest analogy on this point to the
one under consideration is *Irvin v. Gregory,* 86 Ga. 605, 13 S.
E. 120.   By a statute of that state the board of education
of the town of Lumpkin was required to exact "of each child"
an incidental fee of not less than five nor more than ten dol-
lars.   The constitution of the state prohibited the exaction of
any tuition fee or charge to resident pupils, but such a charge
might be imposed on nonresidents.   The court held that the
constitutionality of the act could be sustained on the ground
that the provision in regard to the incidental fee was intended
to apply only to nonresident pupils.   So we think here that the
validity of this will can be sustained without doing violence
to its language, by holding that what the testatrix intended
was that a tuition charge might be exacted only from such

pupils as the city of *Oshkosh* could legally exact such a fee from.    The will does not undertake to specify to whom the charge shall be made.    It does not say, as did the Georgia statute, that the fee shall be paid by "each child," but simply that such a tuition fee shall be charged as in the judgment of the city of *Oshkosh* shall be sufficient, together with the income of the fund provided for, to properly maintain the school.    If the income is sufficient, no charge need be made. If the city sees fit to make up any deficit from taxation, no tuition fee need be charged.    If the income, together with the tuition fee which might lawfully be charged, is insufficient to properly maintain the school, and the city should refuse to vote funds for that purpose, it may be said that the privilege of instruction in manual training may be denied to some pupils whom the testatrix intended to provide for and that therefore her wishes may be defeated.    But it would be far-fetched to say that the school will not be more liberally patronized or that a greater number will not receive instruction therein where such instruction is free than would patronize the school if they were compelled to pay for the privilege.

6.  It is argued here and may be conceded that the donation of Mrs. Beach was the impelling cause which produced action on the part of the common council of the city of *Oshkosh,* and that, were it not for the gift, no money would have been presently raised by the city to build a manual training school. And it is argued that the effect of the gift was to hold out a substantial money inducement to influence official action and to thus bring about results which would not have followed had no conditional gift been made.    Corporate action is said to be void under such circumstances, and the following cases in our own court, as well as some others, are cited in support of this view: *Shelby v. Miller,* 114 Wis. 660, 91 N. W. 86; *State ex rel. Wildman v. Kidd,* 63 Wis. 337, 23 N. W. 703; *McMillan v. Fond du Lac,* 139 Wis. 367, 120 N. W. 240; *State ex rel. Newell v. Purdy,* 36 Wis. 213; *State ex rel. Dith-*

*mar v. Bunnell,* 131 Wis. 198, 110 N. W. 177; and *Sharpe v. Hasey,* 141 Wis. 76, 123 N. W. 647. To these might be added *State ex rel. Curtis v. Geneva,* 107 Wis. 1, 8, 82 N. W. 550, and *State ex rel. Dosch v. Ryan,* 127 Wis. 599, 106 N. W. 1093. The cases of *Shelby v. Miller, Sharpe v. Hasey,* and *State ex rel. Dosch v. Ryan* presented situations where a resident of a town was personally and pecuniarily interested in having a highway laid out for his convenience, and where, for the purpose of securing something which he otherwise would not get, he offered to defray a portion of the expense of opening the highway in order to bring about favorable official action. The cases of *State ex rel. Newell v. Purdy* and *State ex rel. Dithmar v. Bunnell* involved pre-election offers and representations made by candidates as to what they would do in the event of their election. In the *Purdy Case* the candidate agreed to relinquish part of his salary and in the *Bunnell Case* he offered to draw certain legal papers free of charge. *State ex rel. Wildman v. Kidd* involved an unlawful agreement concerning a division of property in case a new school district was created, and *McMillan v. Fond du Lac* involved a contract in which an alderman of the city was personally interested. This latter case has no direct bearing on the point under consideration. The other cases are decided upon the theory that the offers made were made to secure a direct and substantial benefit to the parties making them; that they were not primarily made to promote the common good; that they were well calculated to secure results which would not be secured had no such offers been made; and that such offers in substance and effect constituted bribery, which as a matter of course vitiated any official action taken in pursuance of such inducement.

The situation here is very different. The testatrix herself could reap no material benefit from her offer. She left no children who could enjoy the fruits of it. It does not appear that she left any relatives in *Oshkosh* who could do so. She

had no ulterior or vicious motive in doing what she did, and counsel do not assert that she had. Any such suggestion would be repugnant to our sense of decency and no such suggestion is made. So the reason on which the decisions cited rest is wanting in the case before us, and unless their doctrine is carried beyond its present confines the point is not well taken; and it is said in *Sharpe v. Hasey, supra,* that the doctrine has been carried far enough. It is argued that the sustaining of gifts coupled with conditions such as Mrs. Beach made may result in all kinds of municipal extravagance in order to meet conditions that may hereafter be made by donors. Whether such a situation is likely to arise or not we do not know. If such results follow, the legislature may easily and readily enact a law that will put a quietus on the abuse. Charitable gifts not coupled with any such condition as is complained of may become inimical to the welfare of society also; but even that abuse, if such it should ever become, can be met by the legislature enacting statutes of mortmain as was done by the British parliament. The cases sustaining the right of a municipality to accept a gift for a purpose which it is authorized to carry on and to support by means of taxation, and to accept such gift on the condition that such municipality make a contribution to the fund, are cited elsewhere in this opinion, and, as already said, correctly state the law in this regard.

7. (a) It is further urged that the bond issue is void because the city charter of the city of *Oshkosh* (sec. 6, subch. XI, ch. 59, Laws of 1891) provides that no school building shall be constructed until the plans for the same shall have been adopted and approved by the board of education, and that no action whatever was taken by such board in reference to the manual training school for which the bonds were voted. The contention is that the requisite foundation for taking any steps to build any school building are wanting because of nonaction by the school board.

The position taken is not tenable.    By subch. XI of the city charter the title to all school buildings is vested in the city. It is made the duty of the board of public works under the direction of the common council to erect school buildings and keep them in repair.    The common council has the exclusive right to levy taxes and provide for the erection of school buildings:    The school board may approve or disapprove of proposed plans for a school building, but the right to propose such plans is vested in the city.

Either of two methods might be pursued by the city.    It might first prepare plans and secure estimates of the cost of such a building as it deemed desirable to build, and then proceed to provide for the necessary funds to carry out the proposed project as best it could, or it might first make provision for the amount of money which it was considered desirable to expend, and fit its plans to its purse.    Perhaps the first method of procedure would be the more logical, but it is not exclusive, and we are not cited to any provision in the charter which makes the adoption of plans a condition precedent to the right to vote bonds to raise money to erect a school building.

(b) Again, it is urged that sec. 7 of subch. XI of the charter requires the city treasurer to keep all moneys raised for school purposes as a separate fund, and disburse the same only on the orders of the board of education, and that the money here raised was tendered to the trustees named in the will to create a common fund, part of which might be used for building a school and part for the purposes of investment, the income of which only would be available to the city.

We have already said that the money derived from the sale of the bonds must be applied for the purpose for which it was voted, to wit, to build a school building, and that this is a substantial compliance with the terms of the will.    It does appear from the record that the city went through the form of making a tender to the trustees of the $50,000 derived from

the sale of the bonds.   It was not required to make any such tender, and we do not understand that it amounted to anything more than a mere ceremony or formality which was gone through with to satisfy the trustees that the city had raised the .amount of money required by the terms of the will and that it was available for the purposes therein specified.   When the ·city complied with the conditions of the will it was absolutely ·entitled to receive, hold, and expend both funds in its character of trustee.   So we do not perceive how the alleged tender ·could serve to vitiate the bonds or how it created any unlawful diversion of the money received from the sale of them.   W,e ·cannot say, as we are urged to, that it is not the intention of the city of *Oshkosh* in good faith to expend the money raised from the sale of its bonds to erect a school building.   The cir·cuit court so found as a matter of fact.   As yet there has been no diversion, and, as far as we are able to discover, no threat·ened diversion.   If the time comes when the interests of the ·taxpayers are being jeopardized in this regard, the power of ·the courts is ample to protect them.

(c) It is further contended that the bond issue is void be·cause it is not in compliance with the constitution and laws of ·the state.   The particular provisions relied on are sec. 926— 11, Stats. 1898 (as amended by ch. 228 and ch. 428, Laws of 1903), subd. 2 of sec. 658, Stats. (1898), and sec. 3 of .art. XI of the constitution.

Sec. 926—11 provides that no bonds shall be issued unless the council shall provide for a direct annual tax *sufficient to pay the interest thereon* as it falls due and the principal within twenty years.   The statute further provides that all such bonds .shall bear an appropriate name indicating the purpose of their issue and reciting the fact that the city has provided for the ·collection of an annual tax to pay the interest as it falls due and the principal within twenty years.   The other statute re·lied on and the constitutional provision quoted add nothing to

the requirement of sec. 926—11 that is material to the question raised.

The ordinance providing for the bond issue recited that "such bonds shall be due and payable in twenty years after their date and shall bear interest *not to exceed* four per cent. per annum, interest payable annually," and made a tax levy to pay the principal and interest of the bonds.   The particular objection raised is that a levy of a tax to pay interest on $50,000 of bonds at a rate *"not to exceed* four per cent." is not sufficiently definite and certain to answer the provisions of the law referred to.   The bonds issued bear interest at four per cent., so that the amount that must be raised is within the limitation fixed by the ordinance, and has become definite and certain.   We think it would be extremely technical not to hold that the ordinance makes a good tax levy so long as the maximum rate of interest fixed therein was not exceeded. The statute does not require that the ordinance designate in dollars and cents the amount of money that should be levied annually to pay interest.   Such a levy is unlike the ordinary one, in that it provides for something that must be done from time to time in the future, and so long as the amount is subject to definite ascertainment when the tax is to be carried out in the tax roll, and the amount does not exceed that provided for by the ordinance, we do not perceive any valid objection to it.

(d) It is further urged that the bonds are void because they do not bear "an appropriate name indicating the purpose of their issue," as required by sec. 926—11.   The bonds are headed "Manual Training School Bond of the City of *Oshkosh,* Wisconsin," and in the body of them it is recited that they are issued "for the purpose of erecting, constructing, and maintaining a manual training school building in and for the city of *Oshkosh,* to be known as the Orville Beach Memorial Manual Training School of the City of *Oshkosh."*   It appears

plainly enough from the heading of the bonds that they are issued for the purpose of building and equipping a manual training school.   Manifestly, the legislature intended nothing more than a heading which in general terms would disclose the purpose for which the bond was issued.   The bond must be christened and must have an appropriate name indicative of the purpose of issue, but it was not meant that such name should consist of minute recitals showing the dimensions of the building, the subjects that it was contemplated should be taught therein, and such like.

(e) The bond ordinance recited that the bonds were issued "for the purpose of erecting, constructing, and *equipping* a manual training school building."   The city, in voting the bonds, acted under the authority conferred by subd. 3 of sec. 926—11, Stats. (1898), as amended, and it is urged that the city council had no power under this section to vote bonds where any part of the proceeds thereof was to be used for "equipping" a school.   The case of *Neacy v. Milwaukee,* 142 Wis. 590, 126 N. W. 8, is said to be conclusive upon the proposition, if followed.   In the *Neacy Case* the statute involved conferred the right on the city to issue bonds for the construction or purchase of a municipal lighting plant.   The bonds were voted to "erect and *maintain* such a plant."   Maintenance, of course, includes the cost of ordinary repairs and upkeep, and the bond issue was held unauthorized because no statutory authority existed for raising money through the issue of bonds to defray the ordinary upkeep expenses of such a plant.

The statute under which the bonds we are considering were voted authorized the city to vote bonds "for the erection, construction, and completion" of school buildings.   The question is, Are bonds voted to *build* and *equip* a manual training school voted to *build* and *complete* such a school?   Is a school building complete within the meaning of the statute before it

is provided with seats, desks, blackboards, and other necessary
paraphernalia? Is it complete before it is ready for occu-
pancy for school purposes? Is a manual training school com-
plete before it is supplied with the necessary lathes, benches,
and other equipment to carry on manual training work? Is
a city permitted to·raise money by a sale of bonds to erect a
school building, but prohibited from voting enough to seat the
building after it is erected. The word "completion" found
in the statute must be given some force, unless we say it was
intended to be used as synonymous with the words "erection"
and "construction." In principle we see no good reason why
bonds may not be issued to equip a school building after it is
built as well as to erect the building itself, and it cannot well
be said that a school building is complete until it is ready for
use and occupancy. The *Neacy Case* does not reach the ques-
tion here involved. Bonds are a charge against the taxpayer
of the future. They are justifiable because the future tax-
payer derives a benefit from permanent improvements, in the
first cost of which he would not otherwise share. But after
the initial expenditure, ordinary maintenance expense should
be borne by the taxpayers who are presently receiving the
benefit of the improvement. So we conclude that it is within
the power of a city, acting under sec. 926—11, to vote money
to build and *equip* a school building.

We have endeavored to cover all the points raised that we
deem material, and we might say that no new ones have oc-
curred to us. We do not wish to be understood as holding
that all of the questions here discussed could properly be
raised in a taxpayer's action. It is stated in one of the briefs
that there is a proceeding pending brought by one of the heirs,
wherein, we assume, all matters can be and are raised that a
taxpayer might not appropriately reach; and in view of the
importance of the case, the desirability of an early settlement
·of the controversy, and the express wish of the respondent

that the whole controversy be disposed of, we have thought it best to do so.

    *By the Court.*—The judgment and order appealed from are affirmed.

    The following opinion was filed January 30, 1911:

    MARSHALL, J. (*concurring*).    I cannot well forego writing briefly concurring with the decision in this case.    Added to *In re Kavanaugh's Will,* 143 Wis. 90, 126 N. W. 672, it marks such an epoch in our judicial history, I wish to emphasize the event to the end that nothing may be left undone which I can do to so firmly entrench the beneficent principles of the law of charities in our system that all danger of their being hereafter obscured in judicial confusion or misconception, will be effectually guarded against.    " 'Tis strange, 'tis passing strange," that any such guard should be thought of respecting a source of unwritten law.    It would not occur as a matter within reasonable probabilities were it not for the long regrettable history of the subject, particularly in New York, commencing with the enunciation of correct principles in *Williams v. Williams,* 8 N. Y. 525, extending therefrom through the long judicial conflict which followed, and ending with practical elimination from the law of that state of the choicest features thereof, evolved by the wisdom of the ages and grounded in the principles of Christianity; that feature which enables the possessor of wealth to freely devote the same in perpetuity to the betterment of human conditions.

    The elimination here suggested was so effectual by the close of the half century of conflict intervening between *Williams v. Williams, supra,* and *Allen v. Stevens,* 161 N. Y. 122, 55 N. E. 568, that in the latter, speaking of the wrecks which had been wrought and the irremediable loss to humanity which had occurred by its so construing the statute as to defeat the benevolent purposes of those who had desired to perpetuate

their names by the good they might be instrumental in effect-
ing to mankind after their own departure from earthly ac-
tivities, the court said:

"No attempt to create an original charity has survived the
test of an application by the court of the rules of law to the
language employed by the testator."

That conception of the wrong which had been judicially
done moved the court with shadowy aid of new written law,
which under ordinary circumstances would not have been ap-
preciable, to grasp thereat as the drowning man seizes the mer-
est appearance of assistance, and, as we ventured to say in
*Danforth v. Oshkosh,* 119 Wis. 262, 97 N. W. 258, "by an ex-
hibition of heroics which has no parallel in the books," turn
backward to the starting point so unfortunately departed from,
efface the half century of lamentable wandering, and rein-
trench the principles of *Williams v. Williams, supra.*

Our own history challenges attention not much less effi-
ciently to danger of impairment of the law of charities as
handed down by the fathers; upon the false theory, as in New
York, that the statutes were, in the beginning, framed in hos-
tility thereto.   Our lawgivers, at the start, were, in the main,
well schooled in the written law of New York from which ours
was largely modeled.   They must be presumed to have been
imbued with the judicial view then entertained in the parent
state, significantly voiced by the learned chancellor in *Shotwell
v. Mott,* 2 Sandf. Ch. 46, most emphatically repudiating the
suggestion that the statute makers entertained even a suspicion
that their work, either in letter or spirit, would be thought to
have been done with the idea of displacing or affecting in any
way the common law as to charities.   Note the conception of
the subject by the eminent chancellor:

"We inherited from our mother country the law of chari-
table uses, with the blessed spirit that gave rise to it. . . . Did
the revised statutes intend to cut off gifts and devises to chari-
table uses for all time to come?   For if the article 'Of Uses

and Trusts' applies to charitable uses, that must have been the intention in respect of all save devises to corporations directly for their own use.   The proposition is startling, and of vast importance.   And I presume every one on first hearing it, will declare that it is impossible; that no legislature in the nineteenth century could have intended such a result."

However, we must confess that some suggestions in the decisions of this court prior to *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, without decidedly committing the court thereto, were in line with the departure in New York from *Williams v. Williams, supra.*   The revisers of the statutes by suggestion to the legislature, manifestly, endeavored to stem that trend of judicial thought and the legislature promptly acted upon such suggestion, as indicated in my opinion in *Danforth v. Oshkosh,* 119 Wis. 262, 97 N. W. 258.   The judicial leaning was not so firmly entrenched in our system but that in the learned opinion of Chief Justice RYAN in *Dodge v. Williams,* rendered soon after the revision of the statutes, it was brushed aside and the principles of *Williams v. Williams* clearly written into our judicial code.

The unfortunate allusions to the dominating spirit of the opinion in *Dodge v. Williams* and to its letter as well, coming little short of engrafting the lamentable departure in New York upon our system, are sufficiently referred to in detail in *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345, and need not be repeated here.   Effectually, it was thought, though not without some difficulty for want of unanimity, all seeming or real departure from *Dodge v. Williams* was cured in the decision in the *Harrington Case,* the earlier case being given its true dignity as condemning, at least as regards personalty, the idea that the common-law doctrine of charities had been, in any way or to any extent, displaced in this state.   That was reinforced by *Hood v. Dorer,* 107 Wis. 149, 82 N. W. 546, and *Becker v. Chester,* 115 Wis. 90, 91 N. W. 87, 650.

Unfortunately, because of seeming interference as to real estate in *Beurhaus v. Cole,* 94 Wis. 617, 69 N. W. 986, when

we came to *Danforth v. Oshkosh, supra,* the court, not only refused to extend the doctrine of *Harrington v. Pier* to realty, but held in effect, if not in terms, that the common law as to charities respecting real estate had been wholly displaced by written law, and furthermore, created much confusion respecting what was really intended to be covered before.

*So it will be seen the specter of the New York heresy,* I can call it nothing else, which was buried out of sight in that state in *Allen v. Stevens,* 161 N. Y. 122, 55 N. E. 568, and had menaced the situation here for some twenty-five years, at last, effectually, it was feared by the writer, *took a place at our judicial table,* leading to the writing of my appeal, found in the report of the *Danforth Case,* to the blessed spirit that gave rise to the law of charities and to the logic of the history of the subject in New York and that in our own state as well, grounding hope upon the immutability of truth and the assurance of "the inspired apostle" that "charity never faileth," to move the court some time to return to the lines of *Dodge v. Williams* and *Harrington v. Pier;* such lines as applying to realty as clearly in spirit as they do in letter to personalty; and that the lawmaking power might lend its aid to accomplish that end by expressly removing any supposed or real impediment to the consummation of that result. That the heart of the people was not misconceived in making the appeal for legislative aid bears evidence in the fact that, at the first opportunity, ch. 511, Laws of 1905, was spread on the statute books, removing any such impediment in the most explicit terms. Thus was obviated any necessity to again resort to anything in the nature of a judicial invention, as in the *Danforth Case,* in my judgment, to save, though fraught with infirmities, a designed charity, by treating it as a conveyance without trust features and upon condition subsequent; leaving it with the well known infirmities of a benevolence dependent upon the law of private trusts for its survival and administration. Such a speedy removal of the danger discussed in the

opinion by the writer, concurred in by Mr. Justice Sie-
becker, in the *Danforth Case,* was more than could well have
been hoped for when such opinion was written. Such re-
moval was soon judicially recognized here in *In re Kava-
naugh's Will,* 143 Wis. 90, 126 N. W. 672, and is now again
observed with the satisfaction of all and with added signifi-
cance, because of similarity of conditions with those in the
*Danforth Case.*

This case marks then, as said in the beginning, an epoch,
one of monumental character, in our jurisprudence because of
the now more unmistakable restoration and firm entrenchment
in our system than heretofore by *In re Kavanaugh's Will,*
*supra,* of one of the most valuable of our inheritances from
the mother country, "placing our state," without room for
reasonable future controversy, "in the front rank of communi-
ties as regards favoring devises of privately accumulated
wealth to charitable objects." The question submitted in
the *Danforth Case,* "Shall we have incorporated into our sys-
tem the thought so beautifully expressed, 'Charity in thought,
speech, and deed challenges the admiration and affection of
mankind. Christianity teaches it as its crowning grace and
glory and the inspired apostle exhausts his powerful eloquence
in setting forth its beauty and the nothingness of all things
without it'?" has been answered affirmatively in much if not
the same circumstances as those which gave rise to the sub-
mission.

This decision could not well have been otherwise than it is,
regardless of *Danforth v. Oshkosh,* in view of the fact that
the people, aroused by the discussion there, soon spoke with
unmistakable meaning on the subject. I am content to have
it as it is; have it upon the theory that there is efficient room,
under the circumstances, for distinguishing between the two
cases on the question of whether there is a trust feature char-
acterizing the one and none characterizing the other. Doubt-
less, since the creation involved in the former case was wholly,

in spirit, a charity, it was competent to read out of the instrument an intent sustaining it as a conveyance upon condition subsequent, if that could be done within the uttermost boundaries of reason, rather than that the benefaction should fail wholly. I think in the changed situation, wrought by the legislative declaration, the same rules of construction which conserved, to some extent, the efforts of the donor before, saving her creation as a conveyance on condition subsequent, would save a donation now, made in the same language, as a charitable trust with all the added advantages incident to such a trust.

So, from one viewpoint the opinion in this case overrules *Danforth v. Oshkosh,* so far as the court there limited the bequest to the lines of a conveyance upon condition, instead of giving it the effect intended, as I think. Whether I be right in that or not, the broader effect by construction, if need be, should, nevertheless, be given because of the change in the written law. The different result now from that before, doubtless has some support in the fact that the language of the will here, somewhat more emphatically than that in the instrument involved in the *Danforth Case,* gives character to the bequest, expressly, of a charitable trust, as said, in effect, in the able opinion written for the court by my brother BARNES. The points of difference as to the particular vital feature and the dilemma in which the court found itself in the former case, after holding that the statute, respecting realty at least, had displaced the common law as to charities, are sufficiently portrayed in the court's opinion now in harmony with my independent opinion in the former case. They show ample reason, in my judgment, for not following the latter as a precedent, or if it be one on its face for not following it at all, especially because of the legislative declaration.

It were better, perhaps under all the circumstances, that the bequest was sustained as it was in the *Danforth Case* than

that it should have failed wholly.    However, time has only strengthened my opinion then expressed, that the logic indulged in to support the bequest was a mere judicial, though perhaps from one viewpoint justifiable, invention, yet, on the whole, the result was to defeat the real intent of the donor. But if so the infirmity may well be confined to that case. May the incident stand clothed only in its own peculiar characteristic, and so conditioned as not to endanger future efforts of the benevolently inclined to give of their fortunes to charitable objects, a consummation which this case may be regarded as having in great part accomplished.