ESTATE OF MEAD: OSBORN, Administratrix, and others, Appellants, vs. CURRIE and others, Respondents.

*January 13—April 12, 1938.*

314

318

For the appellants there were briefs by *Leberman & Barrett,* attorneys, and *F. H. Leberman* of counsel, all of Sheboygan, for Gordon Osborn, administrator *de bonis non* with will annexed of the estate of James H. Mead; *Buchen & Federer,* attorneys, and *G. W. Buchen* of counsel, all of Sheboygan, for Janet W. Osborn in her capacity as administratrix *de bonis non* of the estate of Jennie L. Williams, and administratrix *de bonis non* with will annexed of the estate of Rebecca J. Mead; and by *Poss, Toelle & Schuler,* attorneys, and *Benjamin Poss* and *H. W. Schuler* of counsel, all of Milwaukee, for Janet W. Osborn, individually, and oral argument by *Mr. Poss, Mr. Schuler,* and *Mr. Buchen.*

*Charles Voigt,* attorney, and *John M. Poole* of counsel, both of Sheboygan, for the respondent successor trustees and trustee.

*Edward C. Schmidt,* city attorney, for the respondent city of Sheboygan.

The following opinion was filed February 15, 1938:

FOWLER, J. As appears from the preceding statement of facts, James H. Mead, deceased, made provision in his will

for a trust fund to be devoted to or toward the establishment and support of a public library in the city of Sheboygan. The provisions of the will respecting this trust are for ready reference given below in the margin.[1]

[1] "Fifth. Because the citizens of the city of Sheboygan have reposed in me such unbounded faith and confidence, I desire to reciprocate in some measure, and take pleasure in, and do hereby bequeath the sum of twenty thousand ($20,000) dollars either in cash, or in shares of stock of Phoenix Chair Company, to that amount at par as my executors shall find best, to be held in trust by my executors and employed as follows, to wit: To found a library in the city of Sheboygan for free public use under such regulations as shall be prescribed by the board of directors thereof, to be known and called 'The Mead Library,' and the said bequest to be paid over and employed upon the following conditions respectively, to wit:

"1st. If the city of Sheboygan shall erect a city hall and provide therein suitable library rooms and accommodations, or shall separately erect a suitable building for library purposes upon any school grounds of said city or other public grounds, either thereof to the approval and satisfaction of Francis Williams and George Heller, hereinafter named as trustees and directors; and if said city shall further provide for maintaining and keeping therein a public library or library and reading rooms, and shall provide for a board of directors to have management of the same, of which board Francis Williams and George Heller shall be members, as representatives of this trust so long as they will faithfully serve therein, then my executors are authorized and directed to pay over said twenty thousand dollars to said Francis Williams and George Heller upon their acceptance thereof as a trust to be expended upon their approval for the purposes and completion of a library, or a library and reading room, at their best discretion, but with authority and discretion in said trustees to reserve such amount thereof as may to them seem best for making future additions to said library to be kept by them invested for such purposes or paid over to the board of trustees therefor as they deem best.

"2nd. If the said city of Sheboygan shall not erect such city hall with such library accommodations therein, or such separate building therefor, within such time as my executors shall fix and notify said city as prescribed therefor, which shall be not less than one year from notice, then if said city shall accept and provide for the care, charge and expenses of maintaining such library and constitute a board of trustees to have charge thereof, of which board Francis Williams and George Heller shall be made members as afore-mentioned, then my executors are empowered and directed to pay over said bequest to said Francis Williams and George Heller upon their acceptance thereof, as a trust, to be expended in the erection of a building and providing

That the will made provision for a charitable trust is plain. See *Maxcy v. Oshkosh,* 144 Wis. 238, 128 N. W. 899, 128 N. W. 1138. Charitable trusts are favored in the law. In absence of a reverter clause the trust cannot be defeated by failure of executors or trustees to carry it out. Courts will compel performance. Courts will not permit trusts to fail for want of trustees, but will appoint successor trustees to carry out the trust when deceased trustees have failed or omitted to do so. These are truisms. 2 Restatement, Trusts, p. 1222, comment *a.* This court has probably gone as far as any in upholding charitable trusts and in effectuating the intent and purpose of testators who provided for them. See *Harrington v. Pier,* 105 Wis. 485, 82 N. W. 345; *Maxcy v. Oshkosh, supra; First Wisconsin Trust Co. v. Board of Trustees,* 225 Wis. 34, 272 N. W. 464, 468.

The provisions of the will above given make clear that the testator intended that the fund provided should be devoted to the support of a public library for the use and benefit of the people of Sheboygan. The fund was to be so devoted whether or not the city erected a building. By paragraph (1), if the city erected a building to house or in which to house the library, the fund was to be by the executors turned over to trustees to be expended by them for the purposes of the library; by paragraph (2), if the city did not erect a building within such time as the executors should fix which should not be less (but might be more) than one year from the time of notice by the executors, then if the city should

a suitable lot for the same (whereof title shall be placed in the board of trustees unless the same is furnished by said city) and furnishing such building and a library therein, provided that no more than $10,000 shall be taken from said bequest for said building and lot, so that at least half of the bequest shall remain for the purchase of books. When the amount of the bequest as aforesaid shall have been expended by said trustees so named, the trust shall be discharged and all title shall vest in the board of trustees for all the purposes aforesaid."

"accept and provide for the care, charge and expenses of maintaining such library," and appoint a board of trustees to have charge of the library of which Mr. Williams and Mr. Heller should be members, the executors were directed to pay over the bequest to Williams and Heller *"as a trust"* to be expended in the erection of a building and furnishing a library therein, but no more than one half should be used for building purposes and at least one half for the purchase of books. The city did promptly provide for the support of a library and create a board for its care. It did not in express terms declare an acceptance of the bequest, but it did substantially perform the conditions of paragraph (2), whether or not the acts stated be construed as a technical acceptance. This paragraph shows the intent of the testator that as little of the fund as possible be used for a building, and as much as possible be used for books. Thus, if the trustees should procure a building to be provided by others than the city, so that the whole of the fund could be expended for books, the wishes of the testator would be more fully and better fulfilled than if the trustees should use part of the fund to construct the building. It is to be noted in this connection that Mr. Williams charged himself as trustee with the fund, thus indicating his acceptance of the trust, without waiting for the city to build. It is also to be noted that he personally received and expended in constructing the library building the $35,000 donated by Mr. Carnegie, and $250 donated by the Woman's Club of Sheboygan. He no doubt was the active and controlling agent in procuring the building fund. Whether he be considered as acting personally or as trustee or as agent of the library board or of the city in procuring it is perhaps not important. The fact is, a building was provided, and the whole fund was at his disposal for the purchase of books. No time was fixed by the will in which Mr. Williams was to act in erecting a building

for the library. Had he immediately after expiration of a year from his notice expended $10,000 for a site and a building, when site and building were procurable from others, he would have gone counter to rather than furthered the intent of the testator. As the city did not erect a building for the library within the year, it was the duty of the executors, unless the executors extended the time for the city to build, as they might have done, to turn over the fund to the trustees at the end of the year, and it was then the duty of the trustees either to use a part of the fund to procure a site and erect a building and use the rest, not less than half and as much as might be, for the purchase of books or to procure the erection of a building with money otherwise procured and use the whole fund for the purchase of books. The site and erection of the building having been procured without use of any portion of the fund, the whole of it should have been devoted to the purchase of books on the completion of the building. The fund not having been so expended it should now be so expended, or if conditions have so changed as to make it more advantageous to the library to expend it or a part of it for library purposes other than books, it should now be devoted to such library use as is deemed most advantageous, unless, as appellants claim, the city has renounced the bequest or forfeited right to it by delay in giving notice of its acceptance, or in conforming to the wish of the testator that the library be known as "The Mead Library," expressed in the part of clause "Fifth" preceding paragraphs (1) and (2) thereof, by so designating the library.

The appellants first urge in support of their contention that the city renounced the bequest, the execution of the agreement between Mrs. Osborn and the city. This agreement purported to renounce the bequest in consideration of a payment of $15,000 by Mrs. Osborn to the city. The trial

court found this agreement was void under the rule of *Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778, as an attempt of the parties to it to divert the greater portion of the fund to purposes other than those directed by the will. The appellants challenge this ruling, but we consider that it was correct. It was held in the *Rice Case* that:

"Parties interested in a testate estate are not competent to substitute their will for that of the testator so as to have the former carried out as if it were the scheme of the latter, and the court is powerless to give validity to any such scheme."

This was adhered to in *Will of Zweifel,* 194 Wis. 428, 216 N. W. 840; *Graef v. Kanouse,* 205 Wis. 597, 238 N. W. 377; *Taylor v. Hoyt,* 207 Wis. 520, 242 N. W. 141. This agreement was not a renouncement of the gift. It was rather a recognition of it and an assertion of claim to the fund under the will. It was in the guise of a compromise or settlement of the respective claims of the parties to the fund, but was in effect an attempt by the parties to divert a part of the fund from the purposes of the trust, and to make a distribution of it contrary to the wishes and direction of the testator, and this the parties were not competent to do. The will having been admitted to probate, the county court cannot by its order disposing of the fund dispose of it in any way contrary to the terms of the will as the terms are construed by the court. There was a petition for construction of the will pending. The court was bound to distribute the fund according to the will as the court construed it. The court could not split the fund and give it in part to one party and in part to the other as the parties claiming interest agreed and thereby defeat the intent of the testator, but was bound to devote it wholly to the purpose of the trust.

It is urged that the leasing of a building for the library for five years in 1897 indicates an intention to renounce or not accept the trust. With this we do not agree. We con-

sider it rather an indication that the city intended to accept, or considered that it had accepted the bequest. It might be considered as an indication that the city intended to take five years in which to erect or procure the erection of the building in case the executors extended the time for so doing, as they were competent to do, or it might be considered as an indication that the trustees might have five years in which to erect or procure the erection of a building if the city concluded not to build. The will did not fix any time for the construction of a building by the trustees. The appointment of a committee at the end of the year from the executors' notice to confer respecting "an extension of time" is inconsistent with renunciation. The "extension of time" in mind manifestly was time for the city to build. The appointment of the committee indicates clearly that the city had not then— seven months after the lease was executed—renounced the bequest, but on the contrary considered that it had accepted it or intended to accept it when it should be paid over for use of the library.

Appellants seem to urge that none of the conditions imposed by paragraph (2) were complied with, and that this indicates renouncement. But, as we have already stated, we consider that these conditions were substantially complied with immediately upon the giving of the notice by the executors in 1897. The controlling conditions in mind of the testator were the establishing of a library, provision for its maintenance, and the appointing of a board of trustees for its care, of which Mr. Williams and Mr. Heller should be members. These conditions were all performed. Acceptance of a bequest in absence of renouncement is presumed. "The law will presume that every gift, whether in trust or not, is accepted until the contrary is proved." 1 Perry, Trusts (7th ed.), p. 462, § 259. This is said more particularly as applicable to a trustee, but it is also applicable to beneficiaries,

as cases cited in note 8 of the section show.  *Furnam v. Fisher,* 44 Tenn. 626; *Goss v. Singleton,* 39 Tenn. 67.

Appellants urge that the acceptance of the Carnegie gift indicates rejection of the Mead bequest.  We consider that the acceptance of the latter is not inconsistent with acceptance of the former.  The Carnegie gift supplemented rather than defeated the Mead bequest.  It operated to render the Mead bequest vastly more beneficial than it would have been had the trustees used part of the fund to construct a building. Nor is acceptance of the Carnegie gift and the placing of the plaque inconsistent with naming the library "The Mead Library."  The plaque merely recognizes the fact that the building was erected with Carnegie funds.  The building is not necessarily the library.  While the word "library" is at times used as comprising both a collection of books and the building or room in which the collection is housed, it is also used as meaning a collection of books, not kept for sale. Webster's Dictionary; Century Dictionary.  The library was in existence when the gift for the building was made. Mr. Mead may well be considered as the founder of the library, as it was his bequest, as the trial court found, that caused the city to establish it.  It is therefore fitting that at this day the library, as distinguished from the building, be named "The Mead Library" as a memorial to him.  The forty-five years which elapsed between the founding and the naming is, it is true, a long period, looking backward, but looking forward it is comparatively nothing.  If the library from now on "be known and called The Mead Library" it is of little consequence that it has not been heretofore so known and called.

Suggestion is made by appellants that the Carnegie gift was accepted instead of the Mead bequest because the latter was not large enough to construct a building and supply books for the library, and urge that this indicates a renounce-

ment of the latter. The conclusion of renouncement might perhaps follow if there had not theretofore been a substantial performance of the conditions of paragraph (2). But as there is necessarily no inconsistency in acceptance of both the gift and the bequest, the conclusion does not necessarily follow.

It is urged that renouncement is indicated by the fact that the city paid no attention to the 1914 letter of Mr. Williams as executor, in which he called attention to the bequest, stated that the city had not, as far as he knew, accepted the bequest, that difficulties in carrying out the will existed, but that they might be overcome by co-operation between the city and the residuary legatees, and that he was ready to turn over the fund "according to the conditions and directions" of the will.

This letter at least indicates that the city had not renounced the bequest, and the opinion of Mr. Williams that if it had not already accepted it, it might yet do so. Mr. Williams apparently had in mind that some act of the residuary legatees was necessary in order that the fund might be devoted to library purposes. In considering that the residuary legatees had anything to say about the matter, and that co-operation on their part was necessary to enable him to devote the fund to the purposes of the trust, Mr. Williams was in grievous error. This has been above shown. The *Will of Rice Case* which had then been decided ruled that point. Perhaps why nothing was then done by the city was that the residuary legatees claimed they were entitled to the fund and refused to "co-operate" so that the city council considered there was nothing for them to do under the circumstances. The evidence does not disclose such to be the fact. But the evidence does not disclose why the city did not then act. The reason for absence of action by the city council is wholly in conjecture. But, as the county court held, and as we hold, it was for the executors to act, not the city council. They

should have turned over the fund to the trustees to use to purchase books on the acceptance of the Carnegie gift, which made unnecessary use of any portion of the fund for erecting a building. It is inconceivable that had the executors done this either in 1914 or at any time prior thereto, the city or the library board in its behalf would have refused to accept such books as the trustees purchased and delivered or offered to deliver. It is to be borne in mind that the trustees, not the city, were to receive the fund and to disburse it for the purchase of books or otherwise under paragraph (2). Not having theretofore done this, they should have done it on the sending of the letter. The obligation so to do remained continuous, and never having been complied with by them, it must now be complied with by their successor, the administrator *de bonis non*. Doubtless the city might have brought action for construction of the will and to compel performance of the trust. But the residuary legatees might have brought action for such construction and payment of the fund to them. Mr. Williams might have asked construction of the will and direction of the court, and if in doubt what to do should have done so. It was, as the trial court held, for Mr. Williams to move in the matter, and that he did not move, more than to keep the fund segregated and account for it as "trustee," does not bar the city from now asserting its rights to the fund. It is significant that neither Mrs. Mead nor Mrs. Williams made claim to the fund during their lives, and their estates were settled without their administrators making claim to it. It is also significant that Mr. Williams, a lawyer of ability and wide experience, made no claim for it in their behalf, but always held it as trustee of Mead. His idea and that of his wife and daughter may have been that it should be held until the accumulations made it a bequest of great magnitude.

The appellants urge that the lapse of time between the giving of the notice to the city and the final acts of the city in

formally expressing its acceptance of the bequest and the designating of the library as "The Mead Library" caused the bequest to lapse. In support of this contention it is stated that the wish of Mr. Mead that the library be known as "The Mead Library" was a condition applying to both alternatives (1) and (2). But so designating the library was not imposed as a condition. The only conditions of the bequest were those following the introductory paragraph of the bequest in which the wish was expressed, which were expressly stated in paragraphs (1) and (2). It is true that a legacy lapses that is given upon a condition precedent which is not performed. But naming the library "The Mead Library" was not made a condition precedent. In absence of specific words manifesting intention to impose a condition, conditions will ordinarily not be implied. Even where the word "condition" is used, the instrument creating a charitable trust will not be interpreted as imposing a condition in absence of a reverter clause. 2 Restatement, Trusts, p. 1223, comment *b*. Lapse of time is not in itself significant. "So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law." 4 Bogert, Trusts and Trustees, § 948. The instant trust being a continuing express trust, not repudiated by the trustee, the statute of limitations does not apply. *Bostwick v. Estate of Dickson,* 65 Wis. 593, 26 N. W. 549; *Boyd v. Mutual Fire Asso.* 116 Wis. 155, 173, 90 N. W. 1086, 94 N. W. 171. The case falls within those recognized in *Merton v. O'Brien,* 117 Wis. 437, 440, 94 N. W. 340, where it is said that the rule applies to "technical and continuing trusts, which are not cognizable at law, but fall within the proper, peculiar, and exclusive jurisdiction of courts of chancery." The application of the successor trustees is thus "within the limits allowed by law." Mr. Williams accepted the trust, and the report filed by him as trustee shortly before his death acknowledged his status as

trustee. At any time before his death the city might have applied to the court to compel application of the fund to library purposes. The application for such application of the fund by the administrator *de bonis non* who has possession of it is certainly timely. As further said in the section from Bogert, above cited, it is only "when, knowing his rights, he [the *cestui*] takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as estoppel against the assertion of the right." The position of Mr. Williams did not, and that of the administrator *de bonis non* has not, become so changed as to render the delay prejudicial. "As between trustee and *cestui que trust,* in the case of an express trust, the statute of limitations has no application, and no length of time is a bar." 2 Perry, Trusts, p. 1468, § 863.

The appellants claim that if the trust be upheld, the bequest was in character a general legacy, and that therefore the accretions thereto do not go to the beneficiary but belong to the estate and should be paid to Mrs. Osborn. If it be true that the bequest of the stock is a general legacy it does not follow that the successor trustees are not entitled to accretions. The rule relied on by the appellants is stated by their counsel as follows: "The rule is well established that a general legacy ordinarily does not carry with it dividends or interest earned thereon between the time of the testator's death *and the time the legacy becomes payable* and that such income falls into the residuary estate." Assuming the rule to be as stated, the fund became payable by the executors to the trustees at the expiration of one year from the time of the notice by the executors, and should then have been applied or held for application by them to the purposes of the trust, and the fund and its accumulations thereafter became

then subject to such application. That they were considered so held and applicable by Mr. Williams appears from his letter of 1914, and from the fact that he charged himself as trustee with them and reported to the court in December, 1934, that he so held them. That the testator intended accumulations of the fund to go for purposes of the trust appears from the provision of paragraph (1) giving to the trustees, in case the city elected to build, "authority and discretion . . . . to reserve such amount thereof as may to them seem best for making future additions to said library to be kept by them invested for such purposes or paid over to the board of trustees therefor as they deem best." This intent should be respected and carried out, although not expressed in paragraph (2) under which the executors and trustees were to act in case the city did not build within the time specified. It is to be noted that the fund in case the city did not build as stated was not to be paid over to the city at all, and in case it did build it was only to be paid to the library board in the discretion of the trustees. In the latter case, the trustees might retain the fund and disburse it and its accretions when and as they deemed best.

The appellants criticize the trial court for applying the *cy pres* doctrine to the instant case. There is no need to apply that doctrine farther than to construe the provisions of the will liberally in support of the trust established by the will, and to extend the provision of paragraph (2) "for purchase of books" to other library purposes in case conditions are now such as to render use of the fund in part for other purposes more needful and beneficial to the library than to expend the whole for books alone. Had the trustees used the fund for erection of a building immediately upon the omission of the city to erect a building within a year from the time of the executors' notice, it would then under paragraph (2) have been the duty of the executors to expend the whole

remaining sum for books, as that was the testator's express direction. But it appears from the testimony, and the trial court found, "That the library facilities of the city of Sheboygan are now inadequate particularly on account of there being an insufficiency of books and also need of branch libraries, and that also part of the upstairs of the present library building contains unused space because of lack of books and equipment, and thus there is an opportunity now to use the funds bequeathed by clause Fifth of the will for the precise purpose described by the testator." We are of opinion that the successor trustees are not limited in their disbursement of the fund to purchase of books only, but may properly devote it to the other uses mentioned in the closing part of paragraph (1). The *cy pres* doctrine has been so fully discussed in the recent case of *First Wisconsin Trust Co. v. Board of Trustees, supra,* that there is no need to discuss it further.

*By the Court.*—The judgment of the county court is affirmed.

The following opinion was filed April 13, 1938:

PER CURIAM (*on motion for rehearing*). A motion for rehearing is filed grounded upon the propositions, (1) that the opinion discloses an error as to an evidentiary fact; (2) that the court erred in its view of the import of the word "accept" in the "2nd" paragraph of the clause of the will under construction and in holding that there was a sufficient compliance by the beneficiary with the conditions of the bequest under that paragraph; and (3) that on the face of the opinion the beneficiary is not entitled to any accretions to the stock prior to 1898 and an accounting must be ordered to exclude accretions prior to that time.

(1) The misstatement of fact referred to is to the effect that Mr. Williams filed with the court an account as trustee

in December, 1934, in which he charged himself as trustee. It is true that Mr. Williams did not file such an account. But there is in the record a paper headed "Francis Williams, trustee, in account with the estate," beginning with the entry "To balance *reported* December 31, 1933," detailing the receipts and expenditures for the year 1934, and concluding with the entry, "balance on hand December 31, 1934." The ·record many pages later shows that this paper was filed by the administrator *de bonis non* and was copied by him from a book of account kept by Mr. Williams. Mr. Williams died in 1935. This fact and the heading of the account and the use therein of the word "reported" led us to infer as stated. However, the error does not affect our decision. The fact that Mr. Williams himself prepared the account as stated in the paper and entered it in his book of account renders the account of as much force as if he had filed it in court.

(2) What is stated in the brief on rehearing under this head was advanced in the original briefs and was duly considered by the court. We see no reason to retract from the position announced in the opinion.

(3) The appellants contended in their original brief that the bequest was a "general legacy," and as such the beneficiary was not entitled to the accretions to the stock which the executors elected to devote to fulfilment of the trust. We quoted from their brief a statement made therein, and stated that upon the rule as contended by them the beneficiary would be entitled to accretions after the legacy should have been paid, which we said was one year from the notice given by the executors to the city that they elected to turn over the stock instead of money in payment of the bequest. This would fix 1898 as the time when the stock should have been turned over, and construing the statement literally would not entitle the beneficiary to the accretions to the stock prior to

1898 if any accrued prior thereto. We were not justified in inferring, as the statement might imply we did infer, that there were no accretions prior to 1898, nor in assuming that the fact that the stock should have been turned over to the trustees in 1898 necessarily ruled the right of the beneficiary to accretions prior thereto. We think it clear that the beneficiary became entitled to the accretions when the stock was set aside by the executors to be applied to fulfilment of the trust. When the executors elected to discharge the bequest by transferring stock instead of paying in money the legacy became in effect a specific legacy. This segregation of the stock entitles the beneficiary to the accretions thereto from the date of the segregation when the election of the executors became operative, for the same reason that a bequest of stock as a specific legacy entitles the legatee to dividends therefrom from the date of the testator's death when the will becomes operative. 3 Woerner, p. 1572. According to the letter of Mr. Williams written as executor in 1914 and sent to the city council of Sheboygan, Mr. Williams segregated this stock for that purpose in 1897. This follows from the following statements in that letter:

"Since 1897 dividends have been paid on the stock so set aside for the payment of the legacy, and such dividends have been invested at interest until the fund outside of the stock amounts to twelve thousand five hundred dollars. The stock has been changed from twenty thousand dollars common stock to forty thousand dollars of four per cent (4%) preferred stock of the company. . . .

"I now notify the city that I hold forty thousand dollars of the four per cent (4%) preferred stock of the Phoenix Chair Co. and twelve thousand five hundred dollars in other securities, and that I am ready to turn the property over according to the conditions and directions of Mr. Mead's will."

The motion for rehearing is denied, with $25 costs.